[Nos. 47423–1, 47436–2, 47450–8, 47571–7, 47660–8.    En Banc.    November 12, 1981.]

ALBERT M. MARK, *Petitioner,* v. THE SEATTLE TIMES, *Respondent.*

ALBERT M. MARK, *Petitioner,* v. FISHER'S BLEND STATION, INC., *Respondent.*

ALBERT M. MARK, *Petitioner,* v. KING BROADCASTING COMPANY, *Respondent.*

ALBERT M. MARK, *Appellant,* v. KIRO, INC., *Respondent.*

ALBERT M. MARK, *Petitioner,* v. GERALD ROBINSON, ET AL, *Respondents.*

733 (1964); Rehon, *The Pension Expectation as Constitutional Property,* 8 Hastings Const. L.Q. 153 (1980).

*Albert Mark,* pro se, *Richard B. Sanders,* and *Kargianis & Austin,* by *Russell A. Austin, Jr.,* for Mark.

*Davis, Wright, Todd, Riese & Jones,* by *Evan L. Schwab* and *Daniel M. Waggoner,* for respondent Seattle Times.

*Williams, Lanza, Kastner & Gibbs,* by *Joseph J. Lanza* and *Douglas A. Hofmann,* for respondent Fisher's Blend Station.

*Riddell, Williams, Ivie, Bullitt & Walkinshaw,* by *Stephen E. DeForest,* for respondent KING Broadcasting Co.

*Preston, Thorgrimson, Ellis & Holman,* by *Gordon G. Conger* and *Robert B. Mitchell,* for respondent KIRO, Inc.

*Lycette, Diamond & Sylvester,* by *O. J. Humphrey III,* for respondents Robinson, et al.

WILLIAMS, J.—In these consolidated defamation cases,

petitioner Albert M. Mark seeks reversal of summary judgments granted against him in five separate actions in King County Superior Court. The Court of Appeals upheld the trial courts in four of the cases. *Mark v. Seattle Times,* 27 Wn. App. 1014 (1980) (unpublished); *Mark v. Fisher's Blend Station,* 27 Wn. App. 916, 621 P.2d 159 (1980); *Mark v. KING Broadcasting Co.,* 27 Wn. App. 344, 618 P.2d 512 (1980); *Mark v. Robinson,* 28 Wn. App. 1028 (1981) (unpublished). The fifth case, Mark v. KIRO, Inc., King County cause No. 856092, comes to us on direct review from the trial court. For the reasons discussed below, we affirm the decisions in both the Court of Appeals and the Superior Court.

These cases stem from news coverage of Medicaid fraud charges filed against Albert M. Mark, a Seattle pharmacist, by the fraud division of the King County Prosecuting Attorney's Office. On December 29, 1976, a deputy prosecutor in the division apparently informed several members of the news media in a press briefing that charges were soon to be filed against Mark and that this was the largest Medicaid fraud case ever filed in the state. At this same time, the prosecutor distributed copies of the information which the prosecutor planned to file, and of the affidavit of probable cause and suspect information report, which were to be filed in support of the State's motion for an order directing issuance of a warrant for Mark's arrest. CrR 2.2(a); LCrR 2.2(g)(2) (King County).

The affidavit of probable cause read, in relevant part:

The instances collected by the Department of Social and Health Services investigators . . . reflects false claims and payments substantially in excess of $75.

Further, in that regard an audit was begun on or about October 12, 1976. . . . Only medicaid prescriptions were picked and the sample taken after being verified resulted in a 63% invalid figure or over $200,000 in fraud billing for the 2⅔ years. . . . A second audit to verify the first with a larger sample (300) was planned. . . . The results of the first audit were communicated to Mark through his attorney and the need for verification using a larger

sample was stressed.

Seattle Times Clerk's Papers, at 36.

The information, which was filed on December 30, 1976, charged Mark with grand larceny, 10 counts of forgery, and tampering with physical evidence. The information did not specify the exact amount of money involved. Instead, it stated that Mark had defrauded the State in an amount greater than $75, the statutory requirement, and that he had submitted "voluminous amounts" of forged and false prescription forms. Seattle Times Clerk's Papers, at 40. Subsequently, the State amended the information dropping five of the forgery counts and the tampering–with–evidence charge.

In June 1977, Mark was found guilty on the larceny and the remaining forgery charges. At trial, the State established invalid claims totaling only about $2,500. The court imposed a 5–year deferred sentence and a 1–year county jail term with work release and also ordered Mark to pay full restitution, but determination of that amount was deferred until a later hearing. To date, no determination has been made. The Court of Appeals affirmed by unpublished opinion in *State v. Mark*, 23 Wn. App. 1050 (1979), but this court reversed the forgery counts of the conviction. *State v. Mark*, 94 Wn.2d 520, 618 P.2d 73 (1980).

Publication of these events by the various respondents was as follows:

### THE SEATTLE TIMES PUBLICATIONS

On December 30, 1976, The Seattle Times ran a banner–type headline that read: "PHONEY PRESCRIPTIONS—$200,000 MEDICAID FRAUD CHARGED". Clerk's Papers, at 145. The article explained that Mark, the owner of two West Seattle pharmacies, had been charged with grand larceny, tampering with evidence, and 10 counts of forgery. The article quoted the chief deputy prosecutor's statement that Mark had submitted "voluminous amounts" of forged and false prescription forms for payment to the Department of Social and Health Services (DSHS). The article further quoted

the deputy prosecutor and a DSHS investigator as stating that a preliminary audit indicated a loss of $200,000 by government agencies over a 32-month period, that this was the State's largest Medicaid fraud case "to date", and that a preliminary audit indicated that 63 percent of the claims submitted to DSHS by Mark were invalid. The Times also reported that when investigators returned to Mark's pharmacy, they found that the files had been "substantially stripped" of the prescription forms needed for a further audit. Clerk's Papers, at 40.

In December 1977, approximately 1 year after the original story was published, the Times printed a report of a prosecution for Medicaid prescription fraud against another pharmacist. One paragraph in that story read:

> The case was the second brought this year by the prosecutor's office against a local pharmacist. Earlier this year, a West Seattle pharmacist, Albert M. Mark, was found guilty of grand larceny and forgery in a case involving about $200,000 in Medicaid claims.

Clerk's Papers, at 142. This later story was written by the same reporter who wrote the original article. The reporter testified in his deposition that he was unsure whether he had referred to news reports of Mark's trial or to the court files when he prepared the second story.

Mark sued The Seattle Times for defamation. The Times moved for either dismissal, CR 41(b), or summary judgment, CR 56. The trial court granted the motion for summary judgment.

### THE KOMO–TV BROADCASTS

Mark complains of five broadcasts made by KOMO–TV. The reports contained some information identical to that in the stories published by The Seattle Times, although there were also some factual dissimilarities. Newscasters quoted the prosecutor as stating that this was the largest case of Medicaid fraud *in memory,* rather than in this state. The reports also stated that the estimated total fraud was $350,000 (or $300,000 in at least one report), rather than

$200,000, and that investigators had found *65 percent* of the Medicaid prescriptions billed to the State were invalid, rather than 63 percent as stated in the affidavit. There was no mention of the preliminary nature of the survey. The reports quoted the deputy prosecutor as stating that Mark forged prescriptions for "patients that didn't exist". Clerk's Papers, at 451. One broadcast depicted a large stack of dollars blowing away in the wind, and another report stated that Mark's willingness to fill prescriptions without first determining whether the State would pay for the medicine might have provided *a motive to cheat the government elsewhere* to recover the amounts DSHS refused to pay on legitimate claims. After Mark was sentenced and ordered to pay restitution, KOMO–TV reported:

> The restitution will be determined in later hearings because the state has never been able to establish how much money Mark actually stole, partially because he destroyed some of the evidence says the prosecutor.

Clerk's Papers, at 456.

Mark sued Fisher's Blend Station, Inc. (d/b/a KOMO–TV), for defamation. The trial court granted the station's motion for summary judgment and the Court of Appeals affirmed. *Mark v. Fisher's Blend Station*, 27 Wn. App. 916, 621 P.2d 159 (1980).

### THE KING–TV BROADCASTS

KING–TV also reported the filing of charges against Mark. The broadcasts contained only the material that was provided in the affidavit of probable cause and information, with two exceptions. On the basis of the deputy prosecutor's statements, KING–TV reported that this was the largest Medicaid fraud suit ever filed in the state and that "Mark filed claims using names of doctors and patients who are eligible for Medicaid, but those doctors and those patients never wrote or received the prescriptions." Clerk's Papers, at 96.

During its January 7, 1977, news broadcast, KING–TV also showed a film clip of Mark talking on the telephone

inside one of his pharmacies. This film was taken by a KING–TV camera operator who had arrived at the pharmacy after it was closed and had walked up a drive leased to tenants. He apparently placed the camera against the window and used spotlights to illuminate the interior of the pharmacy. The telecast of the interior scene took approximately 13 seconds, the remainder of the 53–second film clip consisting of exterior shots.

Mark sued KING–TV for defamation and invasion of privacy. The trial court granted KING–TV's motions for summary judgment on both issues. The Court of Appeals affirmed, with one judge dissenting on the invasion–of–privacy question. *Mark v. KING Broadcasting Co.,* 27 Wn. App. 344, 618 P.2d 512 (1980).

### ROBINSON NEWSPAPERS PUBLICATIONS

The West Seattle Herald, apparently not a daily paper, published its first story on January 5, 1977, a week after charges were filed against Mark. The story stated that Mark had been "charged with defrauding the state of $200,000 in bogus Medicaid drug prescriptions" and that "state officials call [this] the largest Medicaid fraud case the state has ever found." Clerk's Papers, at 80. The story also quoted the deputy prosecutor's statement, published by several of the other respondents, that Mark had submitted "voluminous amounts" of "forged and false prescriptions". Clerk's Papers, at 80. The remainder of the article printed information contained in either the information or the affidavit of probable cause.

In several articles published from January to September 1977, the Herald and The Federal Way News, another Robinson newspaper, covered the details of Mark's arraignment, trial, and sentencing.[1] Some of these stories recounted some of the material printed in the January 5

---

[1]In her affidavit, the reporter who wrote all the Herald and News stories stated that Robinson Newspapers covered the trial in detail, because "Mr. Mark represented a public figure of interest to the geographic area served by defendant's newspapers." Clerk's Papers, at 79.

story. They added nothing new, however, except that the June 12, 1977, story in the News reported that the jury had convicted Mark of "about $2,500", but added that a DSHS investigator stated that "he still believes Mark may have gotten away with 'a quarter of a million dollars' in phoney billings." Clerk's Papers, at 94.

Mark sued Robinson Newspapers for defamation. In a 1–page per curiam opinion, the Court of Appeals affirmed the trial court's order granting respondents a summary judgment, explaining that the recently published decisions in *Mark v. KING Broadcasting Co., supra,* and *Mark v. Fisher's Blend Station, supra,* were controlling.

### THE KIRO–TV BROADCASTS

KIRO–TV also reported the filing of charges against Mark, telling its listeners that Mark was "accused of the defrauding of the state of an estimated $200,000 in Medicaid funds." Clerk's Papers, at 125. In all, at least 14 newscasts over a 9–month period repeated the statement that Mark had been *charged* with fraud amounting to $200,000. At the conclusion of the trial, KIRO–TV reported that the jury had found Mark "guilty of forging some $200,000 worth of Medicaid prescriptions." Clerk's Papers, at 134. Several of the newscasts also repeated the statement, attributed to the deputy prosecutor, that the case was "the biggest Medicaid fraud ever uncovered in Washington State." Clerk's Papers, at 126. Mark brought an action for defamation against KIRO, Inc.

KIRO's motion for summary judgment was granted on the ground that the court found no evidence of either malice or negligence on KIRO's part and that all telecasts and broadcasts were "substantially true and accurate reports of official court proceedings." Clerk's Papers, at 5. We granted KIRO's motion to transfer Mark's appeal to this court and ordered the case consolidated with the other four cases.

The sole issue with respect to Mark's claim of defamation is whether, in each of the cases, the trial court erred in granting the respective respondents' motions for summary

judgment.

At common law, strict liability existed for defamation so long as the plaintiff demonstrated that the statements complained of were (1) false, (2) defamatory, and (3) published. The defendant, however, could raise two affirmative defenses: truth or privilege. *See* W. Prosser, *Torts,* ch. 19 (4th ed. 1971). The burden was on the defendant to establish truth, but if proved, it was a complete defense. The common law recognized several types of absolute and conditional or qualified privileges to publish fair and accurate reports of proceedings of public interest and to make fair comment on facts relating to public figures or public issues. Under the common law, a qualified privilege could be defeated only by proving the publisher either published maliciously or abused the privilege. *See generally Taskett v. KING Broadcasting Co.,* 86 Wn.2d 439, 456–59, 546 P.2d 81 (1976) (Horowitz, J., dissenting); W. Prosser, at 785–96.

Since 1964, however, the United States Constitution has been interpreted to restrict the states' ability to define and impose damages on defamatory speech. In *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964), the Supreme Court held that the first amendment to the United States Constitution prohibits a *public official* from recovering damages for defamation unless "actual malice"—knowledge or reckless disregard of falsity—is established. This rule was extended to any *public figure* in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967). In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), the court concluded that the New York Times' "actual malice" rule, while still applicable to public figures, did *not* apply to news coverage pertaining to private individuals even though that coverage addressed matters of public interest. The court reasoned that a malice requirement would inadequately serve the competing values of vigorous news coverage versus the private citizen's right to recover for injury to reputation. *Gertz,* at 348. *See also Hutchinson v. Proxmire,* 443 U.S. 111, 61 L. Ed. 2d 411, 99

S. Ct. 2675 (1979); Comment, *The Evolution of the Public Figure Doctrine in Defamation Actions,* 41 Ohio St. L.J. 1009, 1018–27 (1980).

In *Taskett,* we relied on *Gertz* in announcing a new rule in defamation actions:

> [A] private individual, who is neither a public figure nor official, may recover actual damages for a defamatory falsehood, concerning a subject of general or public interest, where the substance makes substantial dangers to reputation apparent, on a showing that in publishing the statement, the defendant knew or, in the exercise of reasonable care, should have known that the statement was false, or would create a false impression in some material respect.

(Italics deleted.) *Tasket,* at 445. In effect, the court created a negligence standard for defamation actions involving private citizens in matters concerning the public interest.

After the decision in *Gertz,* in *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 493–95, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975), the Supreme Court held that the First Amendment prohibits a state from imposing sanctions based on the accurate publication of information obtained from judicial records that are open to public inspection. In effect, the court recognized at least a conditional privilege to report such information. The next year, however, the court made it clear that the "public figure–actual malice" rule does *not* automatically extend to an individual merely because of his involvement in civil judicial proceedings. *Time, Inc. v. Firestone,* 424 U.S. 448, 47 L. Ed. 2d 154, 96 S. Ct. 958 (1976).

SUMMARY JUDGMENT STANDARDS

In his several petitions, Mark contends repeatedly that summary judgment was improper because of the following alleged unresolved issues of material fact: (1) whether the facts alleged in the affidavit and information were false and defamatory; (2) whether the statements made by the deputy prosecutor and DSHS investigator were false and defamatory; (3) whether the published reports concerning the affidavit, the information, and the officials' statements

created substantially inaccurate impressions; (4) whether any false impressions that may have occurred were defamatory; (5) whether subsequent reports that Mark was convicted of fraud totaling more than $200,000, rather than fraud involving an undetermined amount in excess of $75, were defamatory; (6) whether it was either an abuse of the conditional privilege, if one exists, or otherwise negligent for the defendants not to have attempted to verify their stories before publication; and (7) whether, assuming a conditional privilege exists, it extends to statements made by officials and to court papers which are not pleadings.

Although the Court of Appeals rejected these contentions, none of the four opinions clearly addresses the threshold question of what standard for summary judgment is appropriate in a defamation case brought by a private individual not required to prove actual malice. *See Taskett v. KING Broadcasting Co., supra.*[2]

■ The function of summary procedures in defamation actions has been described as follows:

> Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power. Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement. . . .
>
> In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. . . . Unless persons, including

---

[2]Several respondents argued below that because of the criminal charge brought against him, Mark is a "public figure" who must prove actual malice. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). Since he failed to allege malice in any of his complaints against the various respondents, they argue summary judgment was proper on that basis.

We need not decide if Mark became a public figure once criminal charges were filed against him, or even if he attained that status once convicted. Assuming that Mark is only required to prove negligence on the part of the respondents, as in *Taskett v. KING Broadcasting Co.,* 86 Wn.2d 439, 546 P.2d 81 (1976), the question is whether he has done so with sufficient evidence to resist a summary judgment. If he has not done so with respect to negligence, then it follows that he likewise cannot have shown malice.

newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self–censors. And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide–open, for self–censorship affecting the whole public is "hardly less virulent for being privately administered." Smith v. People of State of California, 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed.2d 205 (1959).

(Some citations omitted.) *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C. Cir. 1966), *cert. denied,* 385 U.S. 1011, 17 L. Ed. 2d 548, 87 S. Ct. 708 (1967). *See generally* Note, *The Role of Summary Judgment in Political Libel Cases,* 52 S. Cal. L. Rev. 1783 (1979). Similarly, in affirming a summary judgment of dismissal in a defamation case, our Court of Appeals has explained:

Serious problems regarding the exercise of free speech and free press guaranteed by the First Amendment are raised if unwarranted lawsuits are allowed to proceed to trial. The chilling effect of the pendency of such litigation can itself be sufficient to curtail the exercise of these freedoms.

(Citations omitted.) *Tait v. KING Broadcasting Co.,* 1 Wn. App. 250, 255, 460 P.2d 307 (1969).

In a defamation case brought by a public official, this court explained the test for granting a defendant's motion for summary judgment as follows:

As to summary judgment procedure in run–of–the–mill lawsuits, it is well established that the function of the trial court in ruling upon a motion for summary judgment is not to resolve the basic factual issues, with the ultimate finality which is expected and is appropriate at the final or "full–blown" trial stage of a lawsuit. Rather, the trial court's function is to determine whether a genuine issue as to any material fact exists. . . . In defamation actions by public officials, although the summary judgment procedure is basically the same, we are convinced the decisions of the United States Supreme Court have added a new facet, . . . which must now be considered and resolved by the trial courts. In other words, in such defamation actions, if the trial judge at the sum-

mary judgment stage determines that the plaintiff has offered evidence of *a sufficient quantum to establish a prima facie case,* and the offered evidence *can be equated with the standard or test of "convincing clarity"* prescribed by United States Supreme Court decisions, the motion for summary judgment should be denied.

(Citations and footnote omitted.) *Chase v. Daily Record, Inc.,* 83 Wn.2d 37, 43, 515 P.2d 154 (1973).

The Court of Appeals has succinctly restated this rule in a recent case:

[T]he function of the trial court in ruling on a defense motion for summary judgment in a defamation action is to determine if the plaintiff's proffered evidence is of a sufficient quantum to establish a prima facie case with convincing clarity. Unless the plaintiff has done so, the motion must be granted. *Chase v. Daily Record, Inc.,* 83 Wn.2d 37, 515 P.2d 154 (1973); *Exner v. American Medical Ass'n,* 12 Wn. App. 215, 224, 529 P.2d 863, 75 A.L.R.3d 603 (1974).

*Sims v. KIRO, Inc.,* 20 Wn. App. 229, 237, 580 P.2d 642 (1978).[3]

Under our cases, a defamation plaintiff must show four essential elements: falsity, an unprivileged communication, fault, and damages. *Sims,* at 233; Restatement (Second) of Torts § 558 (1977). To make out a prima facie case for purposes of avoiding a summary judgment in favor of respondents, Mark would have to allege as to each element facts which would raise a genuine issue of fact for the jury.

Mark contends that *Taskett,* in establishing a negligence burden for private persons alleging defamation, requires only that a plaintiff meet a preponderance of the evidence

---

[3]Where "actual malice", that is, a defendant's state of mind is at issue, the United States Supreme Court in dicta has recently called into question the frequent state practice of summary disposition in such cases. *Hutchinson v. Proxmire,* 443 U.S. 111, 120 n.9, 61 L. Ed. 2d 411, 99 S. Ct. 2675 (1979). Nonetheless, the general rule appears to require that plaintiff must produce some affirmative evidence to indicate that malice existed, or the court will grant summary judgment. 10 C. Wright & A. Miller, *Federal Practice* § 2730, at 590–92 (1973), and cases cited therein. Since malice is not alleged in the present case, *Hutchinson* is inapposite on this issue.

standard and thus that the convincing clarity standard is not approved by this court. *Taskett* did not discuss the standard of proof, however, but only the standard of liability (negligence rather than malice). *Taskett v. KING Broadcasting Co.*, 86 Wn.2d 439, 447, 546 P.2d 81 (1976).

Furthermore, the policy reasons, rooted in the First Amendment, for an early testing of plaintiff's evidence by a convincing clarity burden continue to be persuasive. *Chase v. Daily Record, Inc., supra; Washington Post Co. v. Keogh, supra; see also Tait v. KING Broadcasting Co., supra.* Accordingly, we do not retreat from the rule announced in *Chase* and followed in *Sims,* and we adhere to the requirement that a defamation plaintiff resisting a defense motion for summary judgment must establish a prima facie case by evidence of convincing clarity.

I

CONDITIONAL PRIVILEGE

Each of the opinions below held as a matter of law that the publications were privileged to some degree. *Mark v. Fisher's Blend Station,* 27 Wn. App. 916, 919–20, 621 P.2d 159 (1980); *Mark v. KING Broadcasting Co.,* 27 Wn. App. 344, 348–49, 618 P.2d 512 (1980); *Mark v. Robinson,* 28 Wn. App. 1028 (1981) (unpublished). In *Mark v. Seattle Times,* 27 Wn. App. 1014 (1980) (unpublished), the court noted that under the Restatement (Second) of Torts § 611 (1977),

[t]he publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

This statement of the rule is consistent with *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975), in which the Supreme Court held that states may not impose sanctions on the accurate reporting of material from judicial proceedings open to the public:

The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions,

however, are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government.

*Cox Broadcasting Corp.,* at 492. *Accord, Twelker v. Shannon & Wilson, Inc.,* 88 Wn.2d 473, 478–79, 564 P.2d 1131 (1977); *O'Brien v. Tribune Publishing Co.,* 7 Wn. App. 107, 499 P.2d 24 (1972), *cert. denied sub nom. O'Brien v. Franich,* 411 U.S. 906, 36 L. Ed. 2d 196, 93 S. Ct. 1531 (1973); *O'Brien v. Franich,* 19 Wn. App. 189, 575 P.2d 258 (1978).

## A
### Scope of the Privilege

Mark appears to concede that accurate reports of judicial proceedings are privileged, but maintains that the scope of the privilege does not extend to allegations contained in the affidavit of probable cause or to the deputy prosecutor's and DSHS investigator's statements to the press.

The court concluded in each of the cases below that while an affidavit is not technically a pleading, the distinction is not relevant in this instance because both the affidavit and the information are (1) instrumental in the commencement of a criminal prosecution, (2) matters of public record, and (3) verified by the prosecutor. *See Mark v. KING Broadcasting Co., supra* at 349–50. The court also implied that a liberal interpretation must be given to the concept of judicial proceedings because of the strong public interest involved in the privilege. *Mark v. KING Broadcasting Co., supra.*

■ We agree with the Court of Appeals that for purposes of the privilege there is no persuasive difference between the information and the affidavit of probable cause and the suspect information report, both of which support the allegations contained in the information and which were required by local court rule. All are officially filed court documents open to public inspection. Any information reported by respondents, therefore, that reiterated material of record in the proceedings was privileged.

*O'Brien v. Tribune Publishing Co., supra* at 117; *Campbell v. New York Evening Post,* 245 N.Y. 320, 328, 157 N.E. 153, 52 A.L.R. 1432 (1927); *see also* L. Eldredge, *Defamation* 427–31 (1978).

Even assuming publication of facts from the above documents is privileged, Mark further maintains, however, that the scope of the privilege does not extend to publication of the statements of the deputy prosecutor and DSHS investigator that do not appear in the record. The Court of Appeals concluded that it was not required to decide whether those statements were privileged, because they "merely reiterated the material already of record in the proceedings." *Mark v. KING Broadcasting Co., supra* at 353.

The court's conclusion was incorrect on this point, since the media reported at least two statements which do not appear in the court documents—specifically, the deputy prosecutor's statement that this was the largest Medicaid fraud case in the state, and KOMO's report that Mark had submitted prescription payment forms based on "nonexistent" patients. On the other hand, in the present posture of this case, we need not decide whether publication of those statements is beyond the scope of the privilege to report judicial proceedings, unless Mark has alleged facts sufficient to show with convincing clarity that the statements are false. *Chase v. Daily Record, Inc.,* 83 Wn.2d 37, 515 P.2d 154 (1973); *Sims v. KIRO, Inc., supra.*[4] For example, if Mark had alleged facts showing that other Medicaid fraud cases in Washington had involved sums larger than $200,000, and the press had negligently failed to discover this information, then he would have placed the truth of the publications in issue with enough clarity to resist the

---

[4]This conclusion should in no way be taken to mean we approve of the deputy prosecutor's conduct in discussing the case with members of the news media. *See* (CPR) DR 7–107(A), (B). Moreover, as we said in *State v. Mark,* 94 Wn.2d 520, 618 P.2d 73 (1980), these actions were open to criticism under principle No. 7, Bench–Bar–Press Principles and Guidelines (*see* West's Washington Court Rules 1980).

summary judgment.

Applying this principle in the several cases, we note that in Mark v. KIRO, Inc., King County cause No. 856092, Mark alleges in his affidavit that other Medicaid fraud cases in Washington have exceeded $200,000. He does not, however, provide us with relevant facts about or citations to those cases, nor does he allege that KIRO negligently failed to discover them. The bare assertion that such cases exist is insufficient to show the falsity of the statement with convincing clarity. A mere conclusory statement not supported by facts admissible in evidence cannot be considered on a motion for summary judgment. CR 56(e); *Henry v. St. Regis Paper Co.,* 55 Wn.2d 148, 151, 346 P.2d 692 (1959); *Gunnar v. Brice,* 17 Wn. App. 819, 565 P.2d 1212 (1977).

In *Mark v. KING Broadcasting Co., supra,* Mark alleged that "this was not the largest Medicaid fraud case ever filed in the state." Clerk's Papers, at 109. But other than this bare allegation of untruth, Mark provides no facts to controvert the published statement. In *Mark v. Robinson, supra,* and *Mark v. Seattle Times, supra,* Mark similarly alleges that the statement characterizing this prosecution as the largest Medicaid fraud case ever was untrue. Again, this conclusion is not supported by any factual allegations anywhere in the records which were considered by the trial judges in granting the respective respondents' motions for summary judgment.

In *Mark v. Fisher's Blend Station, supra,* Mark likewise alleged the above statement was not true. The record reveals that the fraud division of the King County Prosecutor's Office had dealt with cases involving Medicaid funds which exceeded $2,500, approximately the amount proved in Mark's trial. Mark referred to those cases in his Supplemental Memorandum Resisting Defendant's Motion for Reconsideration, and his reply affidavit dated May 23, 1979. It is plain, however, that the characterization of Mark's case as "the largest" refers to the $200,000 figure which was alleged in the affidavit of probable cause and the suspect information report. There has never been any dis-

pute that cases involving more than $2,500 have been investigated by the fraud division.

We conclude that Mark has not in any of these five actions alleged facts to establish with convincing clarity that the challenged statement was not true.

As to KOMO–TV's report that Mark had submitted names of "patients that didn't exist" (Clerk's Papers, at 124), Mark has not provided any facts tending to show the allegation is not true. In his deposition, however, the deputy prosecutor could not recall having made such a statement, although he expressed his opinion that it would not be possible to use noneligible recipients "because the computer would kick out a non–eligible." Clerk's Papers, at 116. There is nothing in the record showing that the challenged statement was either contained in the official documents or made by the deputy prosecutor or DSHS investigator. It appears that Mark's conviction for grand larceny rested in part on the jury's finding that he submitted prescription billing forms (for drugs never dispensed) which contained, among other entries, the names of patients. *State v. Mark*, 23 Wn. App. 1050 (1979) (unpublished). There is no suggestion that the patients did not exist, but only that the patients named never received the prescriptions for which reimbursement was claimed.

We think that Mark has made a sufficient showing of nonprivilege and falsity to resist a motion for summary judgment as to this one statement and these two elements. Whether he has sustained his claim for negligence and damage will be discussed below.

B

ABUSE OF PRIVILEGE

Even assuming all of the publications were privileged, including those based on interviews with the deputy prosecutor and DSHS investigator, Mark argues (1) that respondents failed to make a reasonable effort to verify their facts by independently investigating the truth of the statements and (2) that their failure to do so was an abuse of the con-

ditional privilege. Moreover, he contends that abuse of the privilege is a question of fact which should have been decided by a jury.

In *Mark v. KING Broadcasting Co.,* 27 Wn. App. 344, 352, 618 P.2d 512 (1980), the Court of Appeals rejected this claim:

> The record here is without any evidence or inference that the three news reports were broadcast without reasonable grounds for belief in the truth of their content. . . . Under the circumstances, the television station was not under an obligation to independently investigate the validity of criminal charges made by the prosecutor . . . Such an obligation would constitute a serious impediment to the dissemination of news and information guaranteed by the First and Fourteenth Amendments. *See Tilton v. Cowles Publishing Co.,* 76 Wn.2d 707, 723, 459 P.2d 8 (1969), *cert. denied,* 399 U.S. 927, 26 L. Ed. 2d 792, 90 S. Ct. 2238 (1970); *Mellor v. Scott Publishing Co.,* 10 Wn. App. 645, 660, 519 P.2d 1010 (1974).

Under the rules established by this court in *Gem Trading Co. v. Cudahy Corp.,* 92 Wn.2d 956, 603 P.2d 828 (1979), the plaintiff has the burden of proving abuse, and proof of falsity alone cannot overcome the privilege. Instead, the plaintiff must "prove by affidavit or otherwise that the statement was published without fair and impartial investigation or without reasonable grounds for belief in its truth." (Footnote omitted.) *Gem Trading Co.,* at 962.[5]

---

[5]While we adhere to the negligence standard enunciated in *Gem Trading Co. v. Cudahy Corp.,* 92 Wn.2d 956, 603 P.2d 828 (1979), we note that the most recent revision to Restatement (Second) of Torts § 600, at 288 (1977) discusses abuse of the conditional privilege as follows:

§ 600. Knowledge of Falsity or Reckless Disregard as to Truth

Except as stated in § 602, one who upon an occasion giving rise to a conditional privilege publishes false and defamatory matter concerning another abuses the privilege if he

(a) knows the matter to be false, or

(b) acts in reckless disregard as to its truth or falsity.

Comment *b* to section 600 states:

*b.* One consequence of the holding [*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974)] is that mere negligence as to fal-

■ As to all statements attributed to the court documents, however, the press is not required to independently verify the allegations contained therein. *Tilton v. Cowles Publishing Co.,* 76 Wn.2d 707, 722–23, 459 P.2d 8 (1969), *cert. denied,* 399 U.S. 927, 26 L. Ed. 2d 792, 90 S. Ct. 2238 (1970). Mark has failed to show that respondents knew or should have known that the statements in the official papers were false. Since we do not decide on this occasion whether a conditional privilege attaches to statements made by the deputy prosecutor, no question of abuse can yet arise as to publication of those statements.

## II
### FALSITY

As we have made clear, Mark cannot complain of the accurate reporting of statements contained in the several official documents at issue in this case. There is no doubt, however, that some of the reported statements were inaccurate, and may have left false impressions. *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 495, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975).

The Supreme Court has held that "inaccurate and defamatory reports of facts" drawn from judicial proceedings are not deserving of First Amendment protection. *Time, Inc. v. Firestone,* 424 U.S. 448, 457, 47 L. Ed. 2d 154, 96 S. Ct. 958 (1976). It is not the law, however, that every misstatement of fact, however insignificant, is actionable as defamation. Indeed, state law requires not only that there be fault on the part of the defamation defendant, but that "the *substance* of the statement '"makes substantial danger to reputation apparent."'" (Italics ours.) *Taskett v. KING Broadcasting Co.,* 86 Wn.2d 439, 443, 546 P.2d 81 (1976), quoting from *Gertz v. Robert Welch, Inc.,* 418 U.S. 323,

sity, being required for all actions of defamation, is no longer treated as sufficient to amount to abuse of a conditional privilege. Instead, knowledge or reckless disregard as to falsity is necessary for this purpose.

Thus, the Restatement would require a defamation plaintiff alleging abuse to show reckless disregard as to falsity. Since we hold Mark has not shown negligent abuse of the privilege, we need not address this question, which awaits another case.

348, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), and *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967).

Several statements broadcast by KOMO–TV and KIRO–TV diverged most widely from the facts contained in the information, affidavit of probable cause, and suspect information report. As noted above, KOMO–TV broadcast the figures "$300,000" and "$350,000" when it reported on the alleged false claims. Clerk's Papers, at 451.

In several broadcasts KIRO–TV reported that Mark had been *charged* with defrauding the State of $200,000, when, in fact, Mark was officially charged with larceny in excess of $75.

## III

### DAMAGE

Mark does not dispute the following facts: (1) that he was charged and convicted of grand larceny and forgery for submitting false Medicaid prescriptions for payment by the State and that his larceny conviction was upheld on appeal. *State v. Mark,* 94 Wn.2d 520, 618 P.2d 73 (1980); (2) that the prosecutor's sworn affidavit of probable cause estimated the amount of money involved in the Medicaid fraud to be over $200,000 and that the suspect information report filed with the criminal action estimated the amount at $231,000; and (3) that the sworn affidavit gave a 63 percent invalid figure derived from the audit sample.

█ It is now generally agreed that a defamation defendant need not prove the literal truth of every claimed defamatory statement. W. Prosser, *Torts* 798 (4th ed. 1971). A defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the "sting", is true. W. Prosser, *supra.*

Courts in other jurisdictions have addressed an issue like the present one, where the media correctly reported an arrest or criminal charge, but exaggerated the dollar amount resulting from the impropriety. In *Turnbull v. Herald Co.,* 459 S.W.2d 516 (Mo. Ct. App. 1970), a newspaper accurately reported that plaintiff had been arrested and

that police had found stolen jewelry in his home at the time of the arrest. The headline read: "'RAID ON HOUSE FINDS THOUSANDS IN JEWELRY'". *Turnbull,* at 518. The plaintiff was eventually released, and no criminal charges were filed. In dismissing plaintiff's claim that the headline was defamatory (plaintiff alleged the jewelry found in his residence was valued at only $500), the court wrote:

> The test then to be applied to the newspaper account of the arrest of the plaintiff was whether it was substantially accurate. There is here no doubt that the arrest was made. Plaintiff was held suspected of burglary. He admitted the arrest in his testimony. The *gist* of the article was the account of the arrest. This was the part that carried the *sting* and would have been defamatory if untrue. But plaintiff himself admits this to be true. His concern and admitted theory of his counsel is defamation by publication of the value of jewelry found in the raid at "thousands of dollars" and the recitation of the opinion or belief of the police officers that some of the items were taken in a burglary of the Mueller jewelry store.
>
> As to the value of the jewelry, preliminary estimates of value by persons who are not expert are frequently inaccurate and apparently were inaccurate in this instance. But the plaintiff testified the items had a value of five hundred dollars, which, although much less than the amount reported, is nevertheless a substantial sum. *As a matter of fact, in an arrest for burglary it would make no great difference what value the items bore. The sting of the article is the arrest of plaintiff suspected of burglary.*

(Italics ours.) *Turnbull,* at 519. *Accord, McCracken v. Evening News Ass'n,* 3 Mich. App. 32, 141 N.W.2d 694 (1966).

In *Dudley v. Farmers Branch Daily Times,* 550 S.W.2d 99 (Tex. Civ. App. 1977), a newspaper published in bold headlines that appellant had been charged with a $168,000 theft. The article explained that an estimated $168,000 worth of polyethylene resin material had disappeared, and the plaintiff was charged with its theft. The criminal complaint against plaintiff charged him with unlawfully and fraudulently taking 62,660 pounds of polyethylene at a

value of $6,655.50. The plaintiff was indicted for this offense, but all criminal charges were subsequently dropped. In the ensuing defamation suit, the appellate court affirmed the trial court's summary judgment for defendant. *Accord, Downer v. Amalgamated Meatcutters,* 550 S.W.2d 744, 747 (Tex. Civ. App. 1977).

Applying the reasoning of these cases to Mark's claim, we think it apparent that the gist of the KIRO–TV and KOMO–TV reports was the arrest for Medicaid fraud involving large amounts of funds. No significantly greater opprobrium attaches to a statement that a person "bilked the state out of at least $300,000" (KOMO–TV Clerk's Papers, at 451) than to one that he was charged with larceny based on an audit sample revealing "over $200,000 in fraud billing". KOMO–TV Clerk's Papers, at 420. The inaccuracy, if any, does not alter the "sting" of the publication as a whole and does not have a materially different effect on a viewer, listener, or reader than that which the literal truth would produce. *See Orr v. Argus–Press Co.,* 586 F.2d 1108, 1112–13 (6th Cir. 1978).

Moreover, Mark has provided no evidence that the inaccurate statements caused him any further damage than has resulted from the conviction and sentence on a grand larceny charge.[6] While we have considerable sympathy with Mark's wish to protect his reputation, we are of the opinion that the errors here under review did not materially add to the damage suffered by Mark by reason of the truthful publication of matters relating to the charge and conviction for grand larceny.

Since Mark has failed in any of these cases to show the above elements of a prima facie case of defamation with convincing clarity, as required by *Chase v. Daily Record, Inc.,* 83 Wn.2d 37, 515 P.2d 154 (1973) and *Sims v. KIRO,*

---

[6]At this stage of the proceedings, we cannot know whether the various figures as reported are accurate or not. The record reveals that the State has failed so far in its efforts to audit Mark's pharmacies in order to set an amount for restitution, as ordered by the trial court and affirmed in *State v. Mark,* 23 Wn. App. 392, 597 P.2d 406 (1979).

*Inc.,* 20 Wn. App. 229, 237, 580 P.2d 642 (1978), it is not necessary to determine whether he has alleged negligence with convincing clarity. We hold, therefore, that the trial courts were correct in granting the respective respondents' motions for summary judgment.

In addition to his defamation action, Mark also sued KING–TV for invasion of privacy arising from the January 7, 1977, telecast of interior and exterior shots of one of Mark's pharmacies. Mark maintains that KING–TV unreasonably intruded upon his seclusion and into his private affairs.

■ The protectable interest in privacy is generally held to involve at least four distinct types of invasion: intrusion, disclosure, false light, and appropriation. Restatement (Second) of Torts § 652A (1977); W. Prosser, *Torts* 804–14 (4th ed. 1971); Prosser, *Privacy,* 48 Cal. L. Rev. 383 (1960). Tort liability for intrusion, the only interest which Mark on appeal claims was violated, has been described as follows:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B, at 378 (1977). The interference with a plaintiff's seclusion must be a substantial one resulting from conduct of a kind that would be offensive and objectionable to the ordinary person. Restatement (Second) of Torts § 652B, comment *d,* at 380 (1977); W. Prosser, *Torts* 808 (4th ed. 1971).

> It is clear also that the thing into which there is intrusion or prying must be, and be entitled to be, private. . . . On the public street, or in any other public place, the plaintiff has no legal right to be alone; and it is no invasion of his privacy to do no more than follow him about and watch him there. Neither is it such an invasion to take his photograph in such a place, since this amounts to nothing more than making a record, not differing essentially from a full written description, of a public sight which anyone would be free to see.

(Footnotes omitted.) W. Prosser, *Torts* 808–09 (4th ed. 1971).

A court has found an actionable intrusion where the press gained entrance by subterfuge to the home of an accused and photographed him there, publishing the photographs without his consent. *Dietemann v. Time, Inc.,* 449 F.2d 245 (9th Cir. 1971). A similar result occurred where a news photographer published a picture taken surreptitiously of a patient in her hospital bed. *Barber v. Time, Inc.,* 348 Mo. 1199, 159 S.W.2d 291 (1942).

In *McLain v. Boise Cascade Corp.,* 271 Ore. 549, 533 P.2d 343 (1975), a plaintiff brought an intrusion action against his employer and a private investigator, whom the employer had hired to investigate plaintiff's suspected fraudulent workers' compensation claims. The investigator crossed plaintiff's property line on a number of occasions to photograph plaintiff in various activities around his residence. In affirming the trial court's granting of an involuntary nonsuit, the Oregon Supreme Court said:

> [P]laintiff conceded that his activities which were filmed could have been observed by his neighbors or passersby on the road running in front of his property. Undoubtedly the investigators trespassed on plaintiff's land while watching and taking pictures of him, but it is also clear that the trespass was on the periphery of plaintiff's property and did not constitute an unreasonable surveillance "highly offensive to a reasonable man".

*McLain,* at 556. *See also* Annot., *Taking Unauthorized Photographs as Invasion of Privacy,* 86 A.L.R.3d 374 (1978).

Here, the affidavits and other material submitted with KING Broadcasting Company's motion for summary judgment, construed most favorably to Mark, establish that Mark, his wife, and a friend were inside one of Mark's pharmacies in the early evening. The store was closed and the door was locked. The KING–TV cameraman walked up a driveway leased to tenants of the building, placed his camera against the window of the store, and photographed

the interior, including Mark, who was on the telephone. The film clip, as shown on the air, was 53 seconds long, with Mark visible for 13 seconds.

There was a factual dispute over whether the cameraman was on public or private property at the time he shot the film. Even if Mark's version were true (that the property was private), however, the place from which the film was shot was open to the public and thus any passerby could have viewed the scene recorded by the camera. *McLain,* at 556.[7] Moreover, a person accused of a crime loses some of his or her claims to privacy. *Hodgeman v. Olsen,* 86 Wash. 615, 150 P. 1122 (1915); *Frith v. Associated Press,* 176 F. Supp. 671 (E.D.S.C. 1959). *See generally* Annot., *Waiver or Loss of Right of Privacy,* 57 A.L.R.3d 16 (1974). Since the intrusion in the present case was a minimal one, publication lasted only 13 seconds, Mark was not shown in any embarrassing positions, and his facial features were not recognizable, we hold there could be no actionable claim in these circumstances.

The Court of Appeals is affirmed in *Mark v. Seattle Times,* 27 Wn. App. 1014 (1980) (unpublished); *Mark v. Fisher's Blend Station,* 27 Wn. App. 916, 621 P.2d 159 (1980); *Mark v. KING Broadcasting Co.,* 27 Wn. App. 344, 618 P.2d 512 (1980); and *Mark v. Robinson,* 28 Wn. App. 1028 (1981) (unpublished). The trial court is affirmed in Mark v. KIRO, Inc., King County cause No. 856092.

BRACHTENBACH, C.J., ROSELLINI, STAFFORD, UTTER, DOLLIVER, HICKS, and DIMMICK, JJ., and HUNTER, J. Pro Tem., concur.

Reconsideration denied January 22, 1982.

---

[7]The present case differs factually from *McLain v. Boise Cascade Co.,* 271 Ore. 549, 533 P.2d 343 (1975), where defendant's employees went uninvited onto private property in order to photograph plaintiff. We express no opinion as to the publication of photographs taken by a trespasser, but note that in the present case it is undisputed that the public had an implied invitation to come upon that portion of Mark's property from which the KING–TV cameraman shot his film.