[No. 10361–7–III. Division Three. June 11, 1991.]

ROY HAUETER, ET AL, *Appellants,* v. COWLES PUBLISHING COMPANY, ET AL, *Respondents.*

*Frank Conklin* and *Murphy, Bantz & Bury, P.S.,* for appellants.

*Duane M. Swinton* and *Witherspoon, Kelley, Davenport & Toole, P.S.,* for respondents.

MUNSON, J.—Spokane Passport, Inc., and its president, Roy Haueter (collectively referred to as Haueter), appeal from a summary judgment dismissing their libel claims against Cowles Publishing Company and reporter Theresa Goffredo (collectively referred to as the publisher). They

contend (1) the court applied the wrong standard of proof, "convincing clarity"; (2) the articles were demonstrably false; (3) statements by the Better Business Bureau are not protected statements of opinion; (4) there are genuine issues of material fact as to the issue of whether the publisher lost its privilege to report statements of government employees by reporting them inaccurately; (5) the publisher acted with actual malice by reporting statements of government officials it knew to be false; (6) statements by the Better Business Bureau should not be accorded privilege; and (7) the court failed to address the claimed defamation which occurred after this action was commenced. We affirm.

Spokane Passport, Inc. (SPI) is a Washington domestic profit corporation "operating a membership organization for the purpose of buying and selling merchandise and services at discounts". Passport Marketing (PM) is a sole proprietorship owned by John Lane. SPI and PM both have used the single name "Passport" in the past. The 1983 Spokane telephone directory carried a listing for Passport Inc., at the same address as SPI, E. 213 Sprague.

In June 1983, an entity designated as "Passport" agreed to raise funds for Spokane City/County Volunteer Search and Rescue. "Passport" was to retain 80 percent of the gross revenues. Mr. Haueter signed two agreements with a search and rescue organization on behalf of "Passport". According to Mr. Haueter, he signed these agreements pursuant to another agreement between himself and Mr. Lane by which Mr. Lane, operating as PM, would sell tickets to shows to be produced and directed by Mr. Haueter in his individual capacity. There is no evidence of any entity called "Passport".

In December 1983, PM employees made telephone solicitations on behalf of the Spokane Area Fire Education Association and the Emergency & Crisis Relief Fund.[1] The script for solicitations on behalf of the Emergency & Crisis

---

[1]Emergency & Crisis Relief Fund, a Washington nonprofit corporation, was incorporated in November 1983, to provide financial support for victims of fire and other needy persons. Its original directors were Mr. Haueter, Billee Haueter,

Relief Fund identified the beneficiary as the "Christmas Benefit Fund" and stated 20 percent of the money raised would be used to buy food baskets for the needy, to be distributed by the Disabled American Veterans Auxiliary.[2] PM retained 80 percent of the proceeds from these solicitation efforts.

Reporter Theresa Goffredo wrote a series of articles about deceptive charitable solicitation activities in Spokane. The articles were published in The Spokesman–Review and Spokane Chronicle, both owned by Cowles Publishing Company, during December 1983.

Articles which appeared on December 7 indicated an organization called Passport Inc., had been soliciting contributions to the Disabled American Veterans Christmas Basket Fund without the consent of the veterans organization. December 8 articles contained further allegations:

> Passport Inc. said it recently started what it calls Emergency Crisis Relief Fund, but Maurice Hickey, general manager for the [Better Business Bureau], said this fund was a phony.
> Hickey said his own investigation found that Passport kept between 60 and 70 percent of the money made through solicitations.
> "The remainder is left for a contribution, if necessary," Hickey said.

These articles said the company used the name Spokane Passport, Inc., identified Roy Haueter as the president of "Passport", and said he was out of town.

Articles appearing on December 30 identified SPI as a telephone soliciting company accused by the State Attorney General's Office of "pocketing most of the funds it raises for charitable groups". Assistant State Attorney General Mike Flynn was reported to have said "Passport" used three

---

and an individual named Shirlee Roland whose address was E. 211 Sprague, Spokane.

[2]According to Mr. Haueter, a disabled veterans organization had in fact authorized "the Emergency & Crisis Relief Fund to use and distribute funds for Christmas baskets for December 1983." (Affidavit of Roy Haueter, exhibit 9.) He has provided a letter from the Kennewick Disabled American Veterans Auxiliary to that effect. The solicitation script, however, indicated the funds would be used to benefit needy families in Spokane.

names: Passport Inc., Spokane Passport, Inc., and Passport Marketing Inc.[3]
The record contains no evidence SPI engaged in telephone solicitation; PM, however, did use "telephone solicitation techniques". SPI's 1983 tax return reflects an address of E. 213 Sprague. When the reporter called the telephone directory number for SPI at E. 213 Sprague, the telephone was answered by a person who identified herself as Sue Wedum. The former Sue Wedum, now Sue Lane, wife of John Lane, was the secretary/bookkeeper/receptionist for PM. According to Mr. Lane, the sole address for PM was E. 211 Sprague. The 1980 articles of incorporation for SPI show a corporate address of E. 211 Sprague. Haueter sued the publisher for libel, seeking actual and punitive damages. The trial court granted the publisher's motion for summary judgment, and Haueter appeals.

## STANDARD OF PROOF

Haueter contends Washington courts extend heightened protection to media defendants in defamation cases in violation of libeled plaintiffs' constitutional rights of privacy and access to the courts.[4] *See LaMon v. Butler,* 112 Wn.2d

---

[3]On December 30, 1983, Mr. Flynn advised Ms. Goffredo SPI was a discount buying service, not a telephone soliciting company; The Spokesman–Review later reported that fact.

[4]The publisher argues the issue was not presented in the trial court and should not be considered on appeal.

The court need not address an issue which was not raised in the trial court. *Wilson v. Steinbach,* 98 Wn.2d 434, 656 P.2d 1030 (1982); *Ronald Sewer Dist. v. Brill,* 28 Wn. App. 176, 622 P.2d 393 (1980). Haueter's trial counsel did not challenge the validity of requiring a defamation plaintiff to establish his case with convincing clarity; indeed, it expressly conceded that was the applicable standard. Issues affecting fundamental constitutional rights may, however, be raised for the first time on appeal. *State v. Santos,* 104 Wn.2d 142, 145–46, 702 P.2d 1179, 70 A.L.R.4th 1021 (1985). Jury instructions which misstated the constitutional standard of fault under the first amendment to the United States Constitution have been held to require independent review of the record, applying the correct standard. *Tilton v. Cowles Pub'g Co.,* 76 Wn.2d 707, 720–21, 459 P.2d 8 (1969), *cert. denied,* 399 U.S. 927 (1970). Here, Haueter's claim the trial court applied an incorrect standard of proof under the First Amendment is an issue affecting fundamental constitutional rights and should be considered.

193, 206–12, 770 P.2d 1027 (Utter, J., dissenting), *cert. denied,* ___ U.S. ___, 107 L. Ed. 2d 29, 110 S. Ct. 61 (1989). Because of the proliferation of cases on defamation since the advent of *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964), it is necessary to review the status of the law in this area.

Under the common law, a defamation plaintiff could recover presumptive damages if he shows he has been referred to by words which are libelous per se and have been published to a third person. *Arnold v. National Union of Marine Cooks,* 44 Wn.2d 183, 187, 265 P.2d 1051 (1954). A publication is libelous per se if it tends to expose a living person to hatred, contempt, ridicule or obloquy, to deprive him of the benefit of public confidence or social intercourse, or to injure him in his business or occupation. *Purvis v. Bremer's, Inc.,* 54 Wn.2d 743, 751, 344 P.2d 705 (1959). When the published words are not libelous per se, special or actual damages must be alleged and proved. *Purvis,* at 747; *Denney v. Northwestern Credit Ass'n,* 55 Wash. 331, 333, 104 P. 769 (1909).

The common law recognizes defenses of consent, truth, absolute privilege and several qualified privileges. *Jolly v. Fossum,* 63 Wn.2d 537, 541, 388 P.2d 139 (1964); *Gaffney v. Scott Pub'g Co.,* 41 Wn.2d 191, 193, 248 P.2d 390 (1952), *cert. denied,* 345 U.S. 992 (1953). A qualified privilege may be lost if the publication is made with malice. *Jolly,* at 542. In this context, the word malice connotes ill will or an absence of good faith. *Jolly,* at 543; *Ecuyer v. New York Life Ins. Co.,* 101 Wash. 247, 257, 172 P. 359 (1918).

Under the common law, the standard of proof applicable to noncriminal libel cases is preponderance of the evidence. *Lunz v. Neuman,* 48 Wn.2d 26, 290 P.2d 697 (1955); *Owens v. Scott Pub'g Co.,* 46 Wn.2d 666, 284 P.2d 296 (1955), *cert. denied,* 350 U.S. 968 (1956).

*New York Times Co. v. Sullivan, supra,* interpreted the First Amendment to require significant changes to the common law of defamation. The United States Supreme

Court established a qualified privilege for defamatory falsehood relating to the official conduct of a public official. *New York Times,* 376 U.S. at 279, 282–83. A public official can recover for defamation only by proving the statement was made with actual malice, defined by the Court as knowledge of falsity or reckless disregard for the truth. *New York Times,* 376 U.S. at 279–80. Moreover, actual malice must be proven with convincing clarity. *New York Times,* 376 U.S. at 285–86. The privilege was extended to defamation of public figures in *Curtis Pub'g Co. v. Butts,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967).

Washington first followed the *New York Times* decision in *Grayson v. Curtis Pub'g Co.,* 72 Wn.2d 999, 436 P.2d 756 (1967). Since then, the constitutional privilege has been applied in numerous cases involving public officials and public figures. *See Herron v. KING Broadcasting Co.,* 112 Wn.2d 762, 776 P.2d 98 (1989); *Herron v. Tribune Pub'g Co.,* 108 Wn.2d 162, 736 P.2d 249 (1987); *Chase v. Daily Record, Inc.,* 83 Wn.2d 37, 515 P.2d 154 (1973); *Tilton v. Cowles Pub'g Co.,* 76 Wn.2d 707, 459 P.2d 8 (1969), *cert. denied,* 399 U.S. 927 (1970); *Tait v. KING Broadcasting Co.,* 1 Wn. App. 250, 460 P.2d 307 (1969).

In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), the Court declined to extend the full protection of the constitutional *New York Times* privilege to defamations of private individuals. Instead, the Court held the states must establish some standard of fault to be proven by a private individual in order to recover for injuries caused by defamatory false-hood. *Gertz,* 418 U.S. at 345–46. However, when liability is not based on a showing of actual malice, "the States may not permit recovery of presumed or punitive damages . . .". *Gertz,* 418 U.S. at 349. *Gertz* was partially modified by *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761, 86 L. Ed. 2d 593, 105 S. Ct. 2939 (1985), holding speech involving "no matters of public concern" is of reduced constitutional value and in such cases states may

permit the award of presumed or punitive damages to a private individual without a showing of actual malice.

Following *Gertz, Taskett v. KING Broadcasting Co.,* 86 Wn.2d 439, 445, 546 P.2d 81 (1976) established a negligence standard of fault, permitting private individuals to recover actual damages for defamatory falsehoods on a showing "the defendant knew or, in the exercise of reasonable care, should have known that the statement was false, or would create a false impression in some material respect". (Italics omitted.) *Taskett,* at 447, also recognized presumptive damages could be recovered upon a finding of actual malice, but under no circumstances would punitive damages be allowed. Washington courts have subsequently applied these principles of liability for defamation of a private plaintiff in numerous decisions. *See Caruso v. Local Union 690 of Int'l Bhd. of Teamsters,* 107 Wn.2d 524, 730 P.2d 1299, *cert. denied,* 484 U.S. 815 (1987); *Dunlap v. Wayne,* 105 Wn.2d 529, 534–35, 716 P.2d 842 (1986); *Bender v. Seattle,* 99 Wn.2d 582, 664 P.2d 492 (1983); *Mark v. Seattle Times,* 96 Wn.2d 473, 486, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124 (1982); *Sims v. KIRO, Inc.,* 20 Wn. App. 229, 580 P.2d 642, *review denied,* 91 Wn.2d 1007 (1978), *cert. denied,* 441 U.S. 945 (1979).

Many of the Washington defamation cases following *New York Times* were decided on summary judgment. *See Herron v. KING Broadcasting Co., supra* at 769; *Herron v. Tribune Pub'g Co., supra* at 169; *Dunlap,* at 531; *Mark,* at 476; *Chase,* at 40; *Sims,* at 233; *Tait,* at 251.

*Tait,* at 255, held review of a motion for summary judgment involving libel of a public figure required the court to determine whether there was substantial evidence which "could persuade a jury with convincing clarity the defendant was guilty of maliciously making a libelous statement". *Chase* reiterated evidence of convincing clarity was required to show actual malice. The court went further, however, and held the issue at summary judgment was whether "the plaintiff has offered evidence of *a sufficient quantum to establish a prima facie case,* and the offered

evidence *can be equated with the standard or test of convincing clarity'* prescribed by United States Supreme Court decisions . . .". *Chase,* at 43 (citing *United Med. Labs., Inc. v. Columbia Broadcasting Sys., Inc.,* 404 F.2d 706 (9th Cir. 1968), *cert. denied,* 394 U.S. 921 (1969)). A careful reading of *United Med.,* however, discloses no basis for such an extension of the application of the convincing clarity standard to all elements of a prima facie defamation case for determining a summary judgment motion.

*Mark v. Seattle Times, supra,* involved a defense motion for summary judgment where the plaintiff was a private person libeled on a matter of public importance. The court recognized the applicable standard of fault was negligence, not malice. Nevertheless, relying on *Chase, Mark,* at 486–87, held for purposes of resisting a motion for summary judgment, a defamation plaintiff must establish all four elements of a prima facie case, *i.e.,* falsity, an unprivileged communication, fault, and damages, by evidence of convincing clarity. *Accord, Sims,* at 233–34.

Each of these Washington cases was decided prior to *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986), the first case in which the United States Supreme Court addressed the standard of proof applicable to defamation summary judgments under the First Amendment. *Anderson,* 477 U.S. at 255, held "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." Since Mr. Anderson was a public figure, the standard of fault was actual malice. The court concluded a factual dispute concerning actual malice must be resolved by determining whether a jury could find the plaintiff has shown actual malice by clear and convincing evidence. Under *Anderson,* the convincing clarity standard of proof is to be applied in deciding a motion for summary judgment only when it would be the applicable evidentiary standard at trial.

In the United States Supreme Court defamation cases, the evidentiary standard of convincing clarity has been

applied only to the issue of fault, and then only where the standard is actual malice: "the proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands . . .", *New York Times,* 376 U.S. at 285–86; "clear and convincing proof of 'actual malice'", *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 511, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984); "a showing of *New York Times* malice is subject to a clear and convincing standard of proof", *Milkovich v. Lorain Journal Co.,* __ U.S. __, 111 L. Ed. 2d 1, 110 S. Ct. 2695, 2703–04 (1990).

■■ Neither the common law nor the First Amendment, as interpreted by the United States Supreme Court, requires proof of any element of a defamation action, other than actual malice, by evidence of convincing clarity. When plaintiff is a private figure, the applicable standard of fault is negligence, not actual malice. *Bender,* at 599. Thus it would appear in a defamation action brought by a private individual, who is only required to meet the negligence standard of fault, the applicable standard of proof, at summary judgment as at trial, should be preponderance of the evidence. *See LaMon v. Butler,* 112 Wn.2d 193, 206–08, 770 P.2d 1027 (Utter, J., dissenting), *cert. denied,* __ U.S. __, 107 L. Ed. 2d 29, 110 S. Ct. 61 (1989).

Haueter's assignment of error focuses on language in *Dunlap,* at 534 n.1, 535, suggesting the applicable standard of proof depends on whether the defendant is a member of the mass communications media. Like *Mark, Dunlap* was decided prior to *Anderson. Dunlap,* at 534–35, held a private individual seeking to recover from a nonmedia defendant for defamatory speech on matters of purely private concern should not have to meet the "convincing clarity" standard of proof to avoid summary judgment. In order to distinguish *Mark,* which had required a private individual to meet the convincing clarity standard, *Dunlap* relied on two factors: the speech in *Dunlap* involved a statement about private affairs, and the defendant was not a member of the mass communications media. The court noted speech

on matters of purely private concern is less deserving of First Amendment protection, citing *Dun & Bradstreet,* and also reasoned concerns about the chilling effect of defamation law on freedom of the press are not present when the defamation defendant is a private individual rather than a member of the media.

*Mark* and *Dunlap* were decided prior to *Anderson v. Liberty Lobby, Inc., supra.* We think the court might have followed different reasoning if it had had the benefit of *Anderson.* As a private citizen libeled on a matter of no public concern, Mr. Dunlap was required to prove only negligence, not actual malice. *See Dun & Bradstreet; Taskett.* The applicable evidentiary standard at trial would have been preponderance of the evidence. Under *Anderson* the convincing clarity standard of proof was therefore inapplicable in *Dunlap.* The result in *Dunlap* is fully supported by the *Anderson* approach without reference to whether the defendant is a member of the media.

■ Indeed, the United States Supreme Court has repeatedly declined to apply First Amendment limitations to defamation law on the basis of whether the defendant is a member of the media. *See Milkovich; Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 779 n.4, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986); *Dun & Bradstreet,* 472 U.S. at 773 (White, J., concurring), 781 (Brennan, J., dissenting); *see also First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 777, 55 L. Ed. 2d 707, 98 S. Ct. 1407 (1978). The Court has relied on two factors which affect how the First Amendment has shaped the common law of defamation: "The first is whether the plaintiff is a public official or figure, or is instead a private figure. The second is whether the speech at issue is of public concern." *Philadelphia Newspapers,* 475 U.S. at 775.

Despite references to media and nonmedia defendants in *Dunlap,* at 534–35, the court recognized that *Dun & Bradstreet* had "restricted First Amendment protection for statements about private affairs" and declined to provide heightened protection to the defendant Dr. Wayne in part,

at least, because the allegedly defamatory statement related to private affairs. Since a factor which distinguished *Mark* from *Dunlap* is "whether the speech at issue is of public concern", Haueter's claim of unconstitutional discrimination on the basis of the media status of the defendant is without merit. *Philadelphia Newspapers,* 475 U.S. at 775.

We conclude that in light of *Anderson,* 477 U.S. at 254, which holds the standard on a summary judgment motion is the same as would be applicable at trial, our Supreme Court would interpret article 1, section 5 of the Washington State Constitution the same way. Whether the defendant is a media or nonmedia publisher is not the test. On this issue, Haueter is correct, but the error was harmless. In the present case, involving a private figure seeking to recover only actual damages for defamation, the standard of fault is negligence, and the preponderance of the evidence standard of proof applies to all the elements of the prima facie case.

## SUMMARY JUDGMENT

A defamation plaintiff must show falsity, unprivileged communication, fault, and damages. *Mark v. Seattle Times,* 96 Wn.2d 473, 486, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124 (1982). To avoid a defense motion for summary judgment, the plaintiff must create a genuine issue of fact as to each element. *Mark,* at 486.

A defense motion for summary judgment is reviewed de novo. *Herron v. Tribune Pub'g Co.,* 108 Wn.2d 162, 169, 736 P.2d 249 (1987). This court applies the same standard of proof as the trial court and determines whether, considering the evidence in the light most favorable to the plaintiff, a jury could reasonably find for the defendant; if so, the motion was properly granted. *See Anderson,* 477 U.S. at 254–55; *Herron v. KING Broadcasting Co.,* 112 Wn.2d 762, 767–68, 776 P.2d 98 (1989). We apply the preponderance of evidence standard in reviewing the summary judgment granted to the publisher in this case.

FALSITY

Haueter contends the evidence demonstrated the newspaper articles were not substantially true. To prevail on its motion for summary judgment, a defamation defendant "need only show that the statement is substantially true or that the gist of the story, the portion that carries the 'sting', is true." *Mark,* at 494 (citing W. Prosser, *Torts* § 798 (4th ed. 1971)).

The gist of the articles was that SPI was involved in a charitable solicitation scheme in which only 20 percent of the funds solicited went to the charitable organizations involved. The record shows (1) Roy Haueter entered into an agreement with John Lane, operating as PM, to produce shows for charitable sponsors, with the sponsors to receive 20 percent of the proceeds; (2) an organization called "Passport" entered into an agreement, signed by Mr. Haueter and Mr. Lane on behalf of "Passport", to raise funds for Spokane City/County Volunteer Search and Rescue, with "Passport" to retain 80 percent of the funds received; (3) PM entered into an agreement with Emergency & Crisis Relief Fund, signed by Mr. Lane on behalf of PM and Mr. Haueter on behalf of Emergency & Crisis Relief Fund, to raise funds for "Christmas baskets" with PM retaining 80 percent of funds received during the term of the contract; (4) SPI entered into a contract with John Lane under which he would test market "Passport" memberships to the general public and train Mr. Haueter "in the entire process of marketing memberships to the general public"; (5) Mr. Haueter was president of Emergency & Crisis Relief Fund; and (6) both PM and SPI used the name "Passport" and both organizations were using E. 211 Sprague as their address in 1983.

There is evidence SPI was a discount buying service and was never a telephone soliciting company or "phony front". A consent decree submitted by the State of Washington, Emergency & Crisis Relief Fund Inc., John and Sue Lane doing business as Passport, Passport Marketing, and Lane

Enterprises and signed by the court on April 11, 1985, provided "Spokane Passport, Inc. . . . is not alleged to have committed or participated in any of the unfair and deceptive business practices contained in the plaintiff's Complaint". Nevertheless, the content of the articles is insufficient to create a genuine issue of material fact, even under the preponderance of evidence standard, as to whether the gist of the allegedly defamatory articles was false. The "sting" portion of the articles is true: PM did retain 80 percent of the proceeds, and the relief agency received 20 percent. Haueter appears to have been inextricably involved in the charitable solicitation activities of PM.

## STATEMENTS OF OPINION

█ Haueter contends Mr. Hickey's statement of opinion is not constitutionally privileged because it implies undisclosed defamatory facts. *Milkovich* rejected the concept of a separate privilege for statements of opinion. Instead, *Milkovich,* 110 S. Ct. at 2706, held "a statement on matters of public concern must be provable as false before there can be liability under state defamation law . . .".

Mr. Hickey's statements, to the effect that Mr. Haueter's organizations were phony fronts, are not provable as false. Rather, they represent the "rhetorical hyperbole" necessary to free public debate. *See Milkovich,* 110 S. Ct. at 2706. Haueter nevertheless contends Mr. Hickey's statement, "The remainder [of money made through solicitations] is left for a contribution, if necessary", falsely implies the organizations were guilty of criminal fraud. While the quoted language suggests a lack of spontaneous generosity on the part of the organization, it does not support any inference of criminally fraudulent activity.

## STATEMENTS OF GOVERNMENT EMPLOYEES

█ Haueter contends the newspaper lost its conditional privilege to report the Attorney General's statements by failing to give a fair and accurate report. State officials, including the Attorney General, have an absolute privilege

to make oral pronouncements to the press which "have more than a tenuous relation to their official capacity". *Gold Seal Chinchillas, Inc. v. State,* 69 Wn.2d 828, 834, 420 P.2d 698 (1966); *State v. Burlison,* 38 Wn. App. 487, 491, 685 P.2d 1115, *review denied,* 103 Wn.2d 1002 (1984). A report of an official action dealing with a matter of public concern is clothed with a conditional privilege, so long as the report is fair and accurate. *Herron v. Tribune Pub'g Co., supra* at 179; *Mark,* at 487–88. Plaintiff bears the burden of proving abuse of a qualified privilege. *Bender v. Seattle,* 99 Wn.2d 582, 601, 664 P.2d 492 (1983).

▮▮▮ Mr. Haueter's affidavit relates a hearsay statement attributed to Mr. Flynn to the effect the December 30 article was "irresponsible reporting". The affidavit of Haueter's former attorney relates another hearsay statement attributed to Mr. Flynn to the effect that prior to December 30 he told the reporter SPI was not a telephone soliciting company. Inadmissible hearsay evidence cannot be considered in ruling on a motion for summary judgment. *Dunlap v. Wayne,* 105 Wn.2d 529, 535, 716 P.2d 842 (1986).

The Attorney General's file contains a written statement from Mr. Haueter dated prior to December 30 declaring SPI was not a professional fundraiser or solicitor of charitable contributions. There is no evidence when, if ever, Mr. Flynn saw the statement, nor is there any evidence this information was conveyed to the reporter prior to publication.

The evidence cited by Haueter is insufficient to create a genuine issue of material fact as to the issue of whether the newspapers lost their qualified privilege to report Mr. Flynn's statements relating to investigation of alleged unfair practices of SPI by failing to report them accurately.

## ABUSE OF PRIVILEGE

▮▮▮ Haueter contends that even if the newspaper had a qualified privilege to report the information provided by the Attorney General's office, the privilege was lost because the reporter knew the statements were false. A qualified

privilege may be lost if the privilege is abused. *Bender,* at 600. Relying on the Restatement (Second) of Torts § 600, at 288 (1977) and decisions in other jurisdictions, *Bender,* at 601, adopted the rule that "knowledge or reckless disregard as to the falsity of a statement is necessary to prove abuse of a qualified privilege."[5]

Based on the assistant attorney general's statements to the reporter, the December 30 articles identified SPI as the telephone soliciting company accused of pocketing 80 percent of the funds it raises for charitable groups. Although Mr. Haueter claims the Attorney General was aware SPI was not a telephone soliciting company before the articles were published, the evidence in support of this claim is minimal, and there is no evidence this information was communicated to the reporter. Given PM's and SPI's use of the name "Passport" on several occasions, and their having the same address, even though the undisputed evidence shows PM was a telephone soliciting business engaged in charitable solicitation, the publication of this possibly erroneous information cannot be deemed to have been done with knowledge or reckless disregard of falsity.

### BETTER BUSINESS BUREAU QUALIFIED PRIVILEGE

Haueter contends the Better Business Bureau does not have a conditional or qualified privilege to inform the public about questionable business practices. Several jurisdictions have extended a qualified privilege to the Better Business Bureau, reasoning a conditional privilege, based on public policy recognizing the need for information to be given for the protection of certain interests of the public, "is necessary to afford protection against liability for misinformation given in an honest and reasonable effort to protect or advance the interest in question." *Trim–A–Way Figure Contouring, Ltd. v. National Better Business Bur.,*

---

[5]Since, under the common law, a qualified privilege could be lost by publishing with malice, in the sense of ill will, *Jolly v. Fossum,* 63 Wn.2d 537, 542–43, 388 P.2d 139 (1964), defining abuse of a privilege in terms of knowledge or reckless disregard in *Bender* is consistent with the *New York Times* definition of malice.

*Inc.,* 37 A.D.2d 43, 45, 322 N.Y.S.2d 154, 157 (1971) (quoting Restatement of Torts 240 (1938)); *Patio World v. Better Business Bur., Inc.,* 43 Ohio App. 3d 6, 538 N.E.2d 1098, 1102 (1989); Restatement (Second) of Torts § 595 (1977); *see Audition Div., Ltd. v. Better Business Bur. of Metro. Chicago, Inc.,* 120 Ill. App. 3d 254, 458 N.E.2d 115, 50 A.L.R.4th 733 (1983).

 Under Restatement (Second) of Torts § 595(1)(b) (1977), this conditional privilege only extends to publications whose recipient is "a person to whom its publication is otherwise within the generally accepted standards of decent conduct." Whether "the publication is made in response to a request rather than volunteered by the publisher . . ." is an important factor in "determining whether a publication is within generally accepted standards of decent conduct". Restatement § 595(2)(a). In each of the cases cited, the Better Business Bureau supplied information only to Bureau members, or in response to questions from individual members of the public. We have found no case where a qualified privilege has been extended to a Better Business Bureau to provide information to the public press for general distribution.

Mr. Hickey's statements on behalf of the Better Business Bureau do not fall within the limits of any previously recognized qualified privilege. In concluding they were privileged, the trial court erred.

However, even if statements of Mr. Hickey on behalf of the Better Business Bureau were not privileged, Haueter failed to create a genuine issue of fact as to whether those statements were false. The articles related the following statements: (1) a telephone soliciting company called Passport Inc., was a phony front; (2) the Emergency & Crisis Relief Fund was a phony; (3) "Passport" kept 60 to 70 percent of the money it made, which is typical of pseudo–charitable organizations; and (4) there is no evidence "Passport" is a nonprofit organization. There is indeed no evidence "Passport" is a nonprofit company or corporation,

and undisputed evidence shows "Passport" and PM contracted to retain 80 percent of funds raised. The remaining information attributed to the Better Business Bureau consists of statements the truth or falsehood of which cannot be objectively determined. *See Milkovich,* 110 S. Ct. at 2706.

SUBSEQUENT PUBLICATION

Finally, Haueter contends the trial court erred in failing to consider the repeated defamation which occurred when The Spokesman–Review again published libelous statements about SPI on December 5, 1985, 2 days after the complaint in this case was filed. The complaint was not amended to allege this article was defamatory, nor was any argument presented to the trial court with respect to the article. An issue not raised in a summary judgment proceeding should not be considered on review. *See Ronald Sewer Dist. v. Brill,* 28 Wn. App. 176, 622 P.2d 393 (1980).

To defeat a defamation defendant's motion for summary judgment, a private figure plaintiff must present evidence which would establish each of the elements of defamation by a preponderance of the evidence. The evidence of falsity and unprivileged communication in this case is insufficient to meet this standard.

Affirmed.

GREEN, C.J., and THOMPSON, J., concur.