[No. 33420-4-I.    Division One.    January 9, 1995.]

ERNST HOME CENTER, INC., *Appellant*, v. UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, LOCAL 1001, ET AL, *Respondents*.

*John P. Mele* and *Ryan, Swanson & Cleveland,* for appellant.
*James H. Webster* and *Webster, Mrak & Blumberg,* for respondents.

COLEMAN, J. — Ernst Home Center, Inc., appeals the trial court's order of summary judgment, dismissing its defamation and Consumer Protection Act (CPA) claims against the United Food and Commercial Workers International Union, AFL-CIO, Local 1001 (Union), and the law firm representing the Union, Webster, Mrak and Blumberg (Webster Defendants). Ernst's complaints arise out of a mailer distributed by the Union and its attorneys to Ernst employees. Ernst contends that the mailer contained false statements that were damaging to its reputation and that the Webster Defendants violated the CPA by soliciting potential clients through the mailer. We affirm.

I

FACTS

Since 1986 the Union has been the collective bargaining representative for a substantial number of Ernst employees. The most recent union contract with Ernst expired October 31, 1992. In October 1992, the Union began negotiating with Ernst over the terms of a new collective bargaining agreement. During the Union's preparation for negotiations, a number of Ernst employees claimed that "off-the-clock work" was occurring.[1] According to Joe Peterson, president of the

---

[1]"Off-the-clock work" refers to time worked but not recorded in the employer's payroll records and for which the employee is not compensated.

Union, some managers were telling employees to record the hours for which they were scheduled to work, but not to record additional hours spent on work-related activities like continuing education.[2] As a result of these reports, the Union proposed new contract language in the form of penalties against Ernst for permitting off-the-clock work. Ernst rejected this proposal at the bargaining table, insisting that company policy had always been to prohibit off-the-clock work.[3]

During an October 8, 1992, bargaining session, Kathryn Norris, Ernst's manager of employee/labor relations, spoke with employee representatives regarding off-the-clock work. She told them that it was Ernst's policy to pay employees for all time worked and that employees who had worked additional hours for which they had not been paid needed to make a claim.[4] The Union responded by distributing a mailer, on or around October 16, 1992, to Ernst employees.[5] The front cover of the mailer stated the following:

> Why has Ernst
> finally agreed to stop
> "off-the-clock" work?
>
> Because the Union
> demanded it at the
> bargaining table!

---

[2]Ernst requires that its employees complete a certain number of continuing education units (CEU's) in order to be eligible for wage step progressions.

[3]Section 4.10 of the collective bargaining agreement reads as follows:
"NO FREE TIME
"The Employer shall be responsible for payment of all hours worked. A staff member shall only work those hours specifically authorized by the Employer. Accordingly, it is intended that there shall be no 'free or time-off-the-clock' work practices under this Agreement. Any staff member found by the Employer or the union to be engaging in such practice shall be subject to discipline which may include termination."

[4]Norris stated in her affidavit, however, that she did not direct her invitation to make claims to the Union or to its president, Joe Peterson.

[5]Because the record is conflicting about whether the Union distributed the mailer only to Ernst union-member employees, or to Ernst nonunion member employees as well, we draw the inference in favor of Ernst that all of its employees, union and nonunion, received the mailer.

Inside, the mailer advised employees that they were entitled to back pay for off-the-clock work and that they could obtain a back pay calculation form either by sending a request to the Ernst Back Pay Task Force or by calling one of two telephone numbers. Peterson stated, by way of affidavit, that the mailer was intended to identify Ernst employees who had worked off the clock and to help those employees calculate how much money Ernst owed them.

On October 29, 1992, Ernst sent a letter to the Union and its attorneys, alleging that the mailer was defamatory and violated the CPA. After learning that neither the Union nor its attorneys would agree to a retraction, Ernst filed a complaint on November 3, 1992, for defamation and a CPA violation. The Union, in turn, filed an unfair labor practices charge with the National Labor Relations Board (NLRB) against Ernst and its attorneys. The NLRB issued a complaint against Ernst and filed a petition with the United States District Court, seeking to enjoin Ernst from litigating its claims.

By letter dated November 17, 1992, Norris responded to a Union request for information. Regarding off-the-clock work, Norris stated:

> At various points throughout negotiations we have stated that a member of the Human Resource Services staff, Matt Boswell, interviewed a number of bargaining unit staff members [on] October 15, 1992, in store 217 regarding possible "off-the-clock" work. . . . Discussion with the staff member included informing him or her of their responsibility to properly account for all time worked on their paycard, including CEU [continuing education units] training that may have taken place away from the workplace, and the necessity of each staff member to take all required rest and lunch breaks on a daily basis. No written record was kept of the conversations, nor were any staff member(s) threatened with discipline for failing to previously report such claims.[6]

Norris also discussed the issue of CEU hours and stated:

---

[6]Norris later explained, "My November 17, 1992, letter has nothing to do with events occurring at the bargaining table prior to publication of the mailer. Merely because a few employees later reported off-the-clock work and are being compensated for it does not change the fact Ernst never agreed to stop a practice it did not permit in the first place."

> Through discussion with store managers we found that a few staff members [13] had not received compensation for all time worked during Holiday decorating parties, store clean-up and CEUs done during personal time. We are in the process of compensating the . . . staff members for all known work time[.]

On April 12, 1993, Ernst served its interrogatories, requesting: (1) the identity of the persons who made the "demand" and "agreement" set forth in the mailer; (2) the identity of the authors and printers of the mailer; (3) the identity of all Ernst employees known by the Union to have worked off the clock; and (4) all documents related to the creation of the mailer. Ernst also noted several depositions that were set to take place shortly after the interrogatories were due.

In May 1993 the parties agreed to stay discovery pending the outcome of the NLRB's petition before the federal district court. Following the NLRB's withdrawal of the petition, Ernst mailed a letter to the Union's attorney on June 17, 1993, setting a response deadline of July 2, 1993. By letter dated July 2, 1993, the Union objected to Ernst's discovery request and refused to provide any discovery. The parties subsequently held a King County Local Rule 37(e) conference. The Union refused to participate in discovery until after a decision had been reached on its motion for summary judgment.

On July 6, 1993, the Union filed a motion for summary judgment, arguing that the court should dismiss Ernst's defamation claim because the statements in the mailer were substantially true. In support of the motion, the Union offered a declaration by Peterson. Regarding the Union's proposed penalties for permitting off-the-clock work, Peterson stated:

> Ernst rejected this proposal, insisting that company policy has always been to pay for all time worked. Ernst's representatives then asked us to identify all employees who had an off-the-clock claim so that they could be compensated. I considered Ernst's statements during the negotiations that employees would be paid for off-the-clock work a commitment by Ernst to stop the off-the-clock work in the sense that the employees would receive compensation for such work.

Peterson also discussed a November 19, 1992, negotiating session in which Ernst was asked whether it paid for all time worked. He stated:

> Several of the employee members of the negotiating committee stated that they or others in their stores had not received pay for time worked after the end of their scheduled shifts. Andrea Gee, an employee at Ernst's Redmond store, stated that she had called Norris and told her that employees at that store were not receiving pay for all time worked, particularly time spent counting their tills after the end of their shifts. Norris said she was aware of that, that it had occurred a long time ago and she had corrected it. Ms. Norris was asked how long ago it had occurred. She answered: in August, 1992. Other employees then spoke up saying similar things happened at their stores. Ms. Norris said that it was Ernst's policy to pay for all time worked, but she knew that some managers did not always get that message. She then said if employees had problems, they should call her and she would make certain if the time was worked they would get paid for it. She also said that if any employee went to their manager, the manager would pay them for time worked.

In response to the Union's motion for summary judgment, Ernst argued that it was entitled to a continuance pursuant to CR 56(f) in order to conduct the discovery refused by the Union. In the alternative, Ernst argued that summary judgment was inappropriate because there were disputed issues of material fact regarding the defamatory nature of the statement on the mailer and the Webster Defendants' CPA liability. In support, Ernst submitted Norris's declaration. She stated that, prior to the mailer's distribution, the Union had never reported off-the-clock work violations or complained that Ernst was permitting off-the-clock work to occur. Norris then discussed the substance of the October bargaining session with the Union, stating:

> On or about October 1, 1992, I met with representatives of Local 1001 to discuss the terms of a new contract. At that time, Local 1001 proposed a contract provision imposing a penalty on Ernst if off-the-clock work is permitted by Ernst. At that time, I informed the Local 1001 representatives Ernst did not and does not approve or permit off-the-clock work and that I had instructed all managers not to permit off-the-clock work.

I told the Local 1001 representatives their proposal was unnecessary. I also informed them Ernst had no knowledge off-the-clock work was occurring, and Ernst remained committed to pay employees for all time worked. Ernst did not "agree to stop 'off-the-clock' work" because Ernst had always prohibited off-the-clock work and had no knowledge off-the-clock work was occurring. I cannot agree to stop something that I already do not permit. I informed Local 1001's representatives I could not agree to a penalty for something when I have no indication it is happening.

. . . .

9. I never stated that some managers did not always get the message that its [sic] was Ernst's policy to pay for all time worked. . . .

The trial court denied Ernst's motion for a continuance to conduct discovery and granted the Union's motion for summary judgment. Ernst's appeal followed.

## II

### STANDARD OF REVIEW

In a motion for summary judgment, the moving party bears the initial burden of showing the absence of a material fact. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (citing *LaPlante v. State*, 85 Wn.2d 154, 158, 531 P.2d 299 (1975)). If the moving party is a defendant and meets this initial burden, then the inquiry shifts to the party with the burden of proof at trial — the plaintiff. *Young*, at 225. The plaintiff must then set forth specific facts showing that there is a genuine issue of material fact for trial. *Young*, at 225-26 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 332 n.3, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) (Brennan, J., dissenting)). The trial court must consider the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party, and the motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion. *Young*, at 226; *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990) (citing *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982)). On review, the appellate court must engage in the same inquiry. *Young*, at 226 (citing *Del Guzzi Constr. Co. v. Global Northwest Ltd.*, 105 Wn.2d 878, 882, 719 P.2d 120 (1986)).

## III

### Defamation

We first determine whether the trial court erred by granting the Union's motion for summary judgment, dismissing Ernst's defamation claim.

### A. Defamation and the National Labor Relations Act

■ Under sections 7 and 8 of the National Labor Relations Act (NLRA), disputes arising between labor and management during collective bargaining are generally within the exclusive jurisdiction of the NLRB. *San Diego Bldg. Trades Coun. v. Garmon*, 359 U.S. 236, 244, 3 L. Ed. 2d 775, 79 S. Ct. 773 (1959). In recognition, however, of the states' compelling interest in maintaining domestic peace, the United States Supreme Court has construed the NLRA to permit state claims for conduct bearing on interests " 'deeply rooted in local feeling and responsibility.' " *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741, 76 L. Ed. 2d 277, 103 S. Ct. 2161 (1983) (quoting *Garmon*, at 244). In particular, the Court has indicated that an employer is entitled to seek local judicial protection from tortious conduct occurring during a labor dispute. *Bill Johnson's*, at 741-42 (citing *Sears, Roebuck & Co. v. San Diego Cy. Dist. Coun. of Carpenters*, 436 U.S. 180, 56 L. Ed. 2d 209, 98 S. Ct. 1745 (1978); *Farmer v. United Bhd. of Carpenters*, 430 U.S. 290, 51 L. Ed. 2d 338, 97 S. Ct. 1056 (1977); *Linn v. United Plant Guard Workers, Local 114*, 383 U.S. 53, 15 L. Ed. 2d 582, 86 S. Ct. 657 (1966); *United Constr. Workers v. Laburnum Constr. Corp.*, 347 U.S. 656, 98 L. Ed. 1025, 74 S. Ct. 833 (1954)).

In *Linn*, the Court specifically addressed the circumstances under which a party in a labor dispute can recover on a state claim for defamation. There, an employer attempted to sue the Union for defamation after the Union circulated a leaflet accusing several managers of lying to employees. *Linn*, at 55-56. The District Court dismissed the claim on the basis of preemption, holding that the alleged conduct was subject to the NLRA. The Court of Appeals affirmed. *Linn*, at 57. On review, the United States Supreme Court reversed,

holding that a party to a labor dispute may recover for defamation in state court as long as he or she proves that the statements were made with malice and caused injury. *Linn*, at 55. In so holding, the Court recognized the states' traditional responsibility of protecting its citizens from defamatory attacks, but found that this interest should not interfere with the national labor policy of promoting free discussion. *Linn*, at 57-63. The Court stated:

> Labor disputes are ordinarily heated affairs; the language that is commonplace there might well be deemed actionable *per se* in some state jurisdictions. Indeed, representation campaigns are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language.

(Citations omitted.) *Linn*, at 58. The Court therefore determined to "limit the availability of state remedies for libel to those instances in which the complainant can show that the defamatory statements were circulated with malice and caused him damage." *Linn*, at 64-65. By "malice", the Court adopted the standard enunciated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964), holding that the publisher of the statements must know that the statements are false or act in reckless disregard of the truth. *Linn*, at 65.

In the present case, the Union distributed the mailer during the course of, and in relation to, its contract negotiations with Ernst. This is the type of conduct typically protected by the NLRA. Therefore, under *Linn*, Ernst can bring its claim only if it shows that the statements in the mailer were defamatory under state law, published with actual malice, and caused injury.[7]

### B. Truth or Falsity and Defamatory Meaning

█ To prevail on a defamation claim in Washington, the plaintiff must prove the following elements: (1) falsity, (2) an

---

[7]At summary judgment, Ernst did not move for dismissal on the basis of malice. That issue, therefore, is not before this court on appeal. We include the foregoing discussion, however, for the purpose of placing this case in context.

unprivileged communication, (3) fault, and (4) damages.[8] *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981) (citing *Sims v. KIRO, Inc.*, 20 Wn. App. 229, 237, 580 P.2d 642 (1978), *cert. denied*, 441 U.S. 945 (1979)), *cert. denied*, 457 U.S. 1124 (1982). Ernst assigns error to the trial court's dismissal of its defamation claim, arguing that there are genuine issues of fact regarding the truth or falsity of the statement on the mailer. In particular, Ernst argues that the mailer falsely alleges that it illegally permitted off-the-clock work to occur.[9] We find that while the mailer may be misleading, the statement of which Ernst complains is not defamatory as a matter of law.

■ When moving for summary judgment, a defamation defendant need not prove the literal truth of the statements made. *Mark*, at 494. Rather, the defendant "need only show that the statement is substantially true or that the gist of the story, the portion that carries the 'sting', is true." *Mark*, at 494 (citing William L. Prosser, *Torts* 798 (4th ed. 1971)). In this case, the statement at issue provides as follows: "Why has Ernst finally agreed to stop 'off-the-clock' work? Because the Union demanded it at the bargaining table!" At summary judgment, the Union succeeded in showing that a portion of the statement was substantially true. Specifically, the Union showed that off-the-clock work had been occurring

---

[8]Relying on *Haueter v. Cowles Pub'g Co.*, 61 Wn. App. 572, 811 P.2d 231 (1991), Ernst contends that it must prove only the element of fault by clear and convincing evidence and the other defamation elements by a preponderance of the evidence. The Union, on the other hand, argues that Ernst must prove every element, including fault, by clear and convincing evidence. Because we would affirm under either standard, it is not necessary for us to address this issue at length. We take pause to note, however, that the court's extensive and thorough analysis in *Haueter* is persuasive. *See Haueter*, at 581-82. As the court indicated there, the case law does not support the extension of the convincing clarity standard of proof to *all* of the defamation elements. Rather, it appears that when the applicable standard of fault is actual malice, the only prima facie defamation element must be proved with convincing clarity is fault (*i.e.*, that the statements were published with knowledge of falsity or with reckless disregard of the truth); the other defamation elements need only be proved by a preponderance of the evidence.

[9]Under state and federal law, an employer must pay its employees for all hours worked. *See* RCW 49.46.020, .130; 29 U.S.C. §§ 206, 207.

and that by directing its employees to make claims and advising its managers to account for all time worked, Ernst, through its conduct, essentially *"agreed* to stop 'off-the-clock' work". (Italics ours.) That is to say, while Ernst may have been acting in a manner consistent with its policy, it nevertheless took steps to correct a practice that was occurring despite its policy. Thus, it is substantially true that, through its conduct, Ernst "agreed" to stop off-the-clock work in response to a Union demand.[10]

The full statement in the affidavit, however, indicates that Ernst *"finally agreed* to stop 'off-the-clock' work". (Italics ours.) As Ernst contends, this statement could be construed to suggest that Ernst knew employees had been working off the clock and refused to pay them. In light of this inference, the statement is problematic because it inaccurately reflects Ernst's response to reports of off-the-clock work.

■■ Nevertheless, our Supreme Court has indicated that not every misstatement of fact is actionable. *Mark,* at 493. Rather, it must be apparent that the false statement or communication presents a substantial danger to the plaintiff's personal or business reputation. *See Mark,* at 493 (citing *Taskett v. KING Broadcasting Co.,* 86 Wn.2d 439, 443, 546 P.2d 81 (1976)). Accordingly, the court must initially decide, as a matter of law, whether the statement or communication is capable of a defamatory meaning. *Swartz v. World Pub'g Co.,* 57 Wn.2d 213, 215, 356 P.2d 97 (1960) (citing *Purvis v. Bremer's, Inc.,* 54 Wn.2d 743, 753, 344 P.2d 705 (1959)). In making this determination, we must give consideration to the fact that the law recognizes a certain degree of latitude that must be afforded to statements made during the course of a labor dispute. *See Linn,* at 61-62. Specifically, in matters between labor and management, the intent of the national labor policy is to promote free and full debate. *Linn,* at 62.

---

[10]Ernst recognized from the outset that the Union was "demanding" change regarding off-the-clock work. In an October 1992 letter to the Union, Norris stated, "[C]onsider this letter as a formal grievance on behalf of the Company over the *Union's demand* to change the long standing past practice in the handling of 'off-the-clock' pay claims." (Italics ours.)

Heated labor disputes, therefore, often present an environment in which an " 'audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole. . . .' ''. *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 41, 723 P.2d 1195 (1986) (quoting *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980)), *review denied*, 107 Wn.2d 1020, *cert. denied*, 482 U.S. 916 (1987). Thus, statements or communications that we might normally regard as defamatory on their face are subject to closer scrutiny when made in this context.

Here, the Union distributed the mailer during an extended labor dispute with Ernst and only to Ernst employees. When viewed in this context, it is obvious that the statement on the mailer is merely union rhetoric. Indeed, the language on the front cover amounts to no more than a Union attempt to demonstrate its strength at the bargaining table. This characterization of the union's language is especially apparent when viewed in light of the undisputed facts: that off-the-clock work had been occurring; that the Union had requested Ernst to stop the practice; that Ernst thereafter directed employees to make their claims; and that Ernst took measures to reinforce its policy against off-the-clock work with its managers. All of these facts certainly provided the Union with a basis for making the kind of "bragging" statement that it did. Thus, while the statement, standing alone, might suggest that Ernst permitted off-the-clock work, the totality of the circumstances shows that a limited audience received this mailer under circumstances making it apparent that the Union was merely "puffing", as it were, and no more.[11] We therefore find that, as a matter of law, the statement on the mailer is not capable of a defamatory meaning given the context in which it was published, and that the trial court did not err by dismissing Ernst's cause of action.

---

[11]We do not address whether the statements in the mailer were merely a matter of opinion because, as Ernst contends, the Union never raised that argument below. RAP 9.12.

## IV

### CONSUMER PROTECTION ACT

We next consider whether the trial court erred by granting the Union's motion for summary judgment, dismissing Ernst's CPA claim.

Ernst assigns error to the trial court's dismissal of its CPA claim, contending that there are genuine issues of material fact about whether the Union's attorneys, the Webster Defendants, violated the CPA by soliciting potential clients through allegedly misleading and deceptive statements in the mailer. The Webster Defendants, on the other hand, argue that dismissal was appropriate because they are exempt from the CPA under the facts of this case. We agree with the Webster Defendants and find that the CPA labor exemption applies.

Washington's CPA explicitly exempts certain activities and organizations from liability. *See* RCW 19.86.060, .070, .170. In particular, RCW 19.86.070 exempts labor organizations from the scope of the act, stating:

> The labor of a human being is not a commodity or article of commerce. Nothing contained in this chapter shall be construed to forbid the existence and operation of labor . . . organizations, instituted for the purposes of mutual help . . . or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof.

There are no Washington cases that construe or apply this provision. Our Supreme Court has indicated, however, that Washington's CPA closely parallels federal antitrust laws. *Golob & Sons, Inc. v. Schaake Packing Co.*, 93 Wn.2d 257, 259, 609 P.2d 444 (1980).[12] Under these laws, Congress has provided for a similar, though not identical, exemption. *See* 15 U.S.C. § 17 (1988). The purpose of this exemption has been described as follows:

---

[12]*See also* RCW 19.86.920, which provides in part:

"The legislature hereby declares that the purpose of this act is to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition. It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts . . . interpreting the various federal statutes dealing with the same or similar matters and that in deciding whether conduct restrains or monopolizes trade or commerce[.]"

The labor exemption to the antitrust laws reflects the accommodation between the congressional policies favoring free competition in the marketplace as reflected by federal antitrust laws, and the labor policies favoring collective bargaining and other union activities reflected by the National Labor Relations Act[.]

(Citation omitted.) *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 830 F. Supp. 1083, 1091 (N.D. Ill. 1993). The federal statutory exemption may only be asserted by a labor organization acting in its self-interest. *Detroit Auto Dealers Ass'n v. Federal Trade Comm'n*, 955 F.2d 457, 464 (6th Cir.), *cert. denied*, 113 S. Ct. 461 (1992). A union's actions are in its self-interest when they bear a reasonable relationship to a legitimate union interest. *Collins v. National Basketball Players Ass'n*, 850 F. Supp. 1468, 1477 (D. Colo. 1991) (citing *Adams, Ray & Rosenberg v. William Morris Agency, Inc.*, 411 F. Supp. 403 (C.D. Cal. 1976)), *aff'd*, 976 F.2d 740 (10th Cir. 1992). Wages, hours, and working conditions are vital and legitimate union concerns. *Warnick v. Washington Educ. Ass'n*, 593 F. Supp. 66, 70 & n.3 (E.D. Wash. 1984) (citing *H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 716 n.19, 68 L. Ed. 2d 558, 101 S. Ct. 2102 (1981)).

Ernst contends that the Webster Defendants are not entitled to the labor exemption under RCW 19.86.070 because they are not a union organization and because "the mailer is dominated by defamatory misrepresentations unrelated to any conceivable advise [*sic*] offered inside." According to Ernst, "the document itself is written to generate new clients for the firm." We disagree.

When the mailer is read in its entirety, it is clear that the Webster Defendants were acting on behalf of the Union to provide Ernst employees with legal advice about back pay for off-the-clock work and to coordinate potential claims. Indeed, the Webster Defendants specifically identify their firm as legal counsel for the United Food and Commercial Workers and "Ernst Back Pay Task Force". Ernst relies only on one statement in the mailer to suggest that the Webster Defendants were acting outside the scope of their represen-

tation. This statement provides: "You may claim back pay for all such work that you have performed during the past three years, even if these work activities were performed voluntarily, at home, before or after scheduled work shifts, or on your day off." Ernst argues that because the collective bargaining agreement requires employees to make wage claims within 15 days of the payday at issue, the Webster Defendants solicited wage claims beyond the collective bargaining agreement and, therefore, outside the scope of their representation. While this statement might not accurately reflect the content of the collective bargaining agreement, it cannot reasonably be construed as an attempt by the Webster Defendants to solicit Ernst employees for all of their potential employee wage claims. Rather, the statement is merely a rendering of legal advice consistent with the Union's effort to help Ernst employees obtain back pay for all time worked off the clock.

Thus, on the whole, the mailer is clear that the Webster Defendants were acting on behalf of the Union in the furtherance of legitimate labor interests and not soliciting potential clients independent of that representation.[13] We therefore find that, pursuant to RCW 19.86.070, the Webster Defendants are exempt from CPA liability and that the order of summary judgment was proper.

## V

### CONTINUANCE

We last decide whether the trial court abused its discretion by denying Ernst's CR 56(f) motion for a continuance to allow for further discovery.

CR 56(f) provides as follows:

**When Affidavits Are Unavailable.** Should it appear from the affidavits of a party opposing the motion that [the party] cannot, for reasons stated, present by affidavit facts essential

---

[13]*Cf. Imperial Constr. Mgt. Corp. v. Laborers' Int'l Union of North Am., Local 96,* 818 F. Supp. 1179, 1184 (N.D. Ill. 1993) (holding that council was a "labor group" because of its dealings on behalf of council's union members in labor disputes involving legitimate union interests); *Warnick v. Washington Educ. Ass'n,* 593 F. Supp. 66, 70 (E.D. Wash. 1984) (holding that insurance agents were a "labor group" because they served union interests).

> to justify [the party's] opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Under this rule, a trial court may properly deny a motion for a continuance under any of the following circumstances:

> (1) the requesting party does not offer a good reason for the delay in obtaining the desired evidence; (2) the requesting party does not state what evidence would be established through the additional discovery; or (3) the desired evidence will not raise a genuine issue of material fact.

*Tellevik v. Real Property*, 120 Wn.2d 68, 90, 838 P.2d 111 (1992) (quoting *Turner v. Kohler*, 54 Wn. App. 688, 693, 775 P.2d 474 (1989)). We review the trial court's ruling only for an abuse of discretion. *Tellevik*, at 90 (citing *Coggle v. Snow*, 56 Wn. App. 499, 504, 784 P.2d 554 (1990)).

As to its defamation claim, Ernst argues that it needed further discovery to identify the individuals who discussed and published the mailer. This information, it claims, would have assisted Ernst in determining whether the Union knew that the statements in the mailer were false. As the Union contends, however, the motion for summary judgment was based solely on the truth or falsity and defamatory nature of the statements; actual malice was not an issue raised on summary judgment. Therefore, what the Defendants actually knew was irrelevant for purposes of deciding the motion.

As to its CPA claim, Ernst contends that it needed additional evidence about the preparation and distribution of the mailer. According to Ernst, this information "bears directly on the entrepreneurial and public interest elements" of its claim. Because we have concluded, however, that the Webster Defendants were immune from CPA liability, the trial court could not have abused its discretion by denying the motion.

In any event, even if the exemption did not apply, Ernst has failed to specifically state what evidence would be established or to identify how such information would have raised a genuine issue of material fact. Moreover, some of this information was, in fact, revealed by the Union in its supporting declaration. In particular, Peterson stated:

Beginning in October, 1992, the mailer at issue was distributed by the Union to its members. Webster, Mrak & Blumberg was asked by the Union to assist in drafting the mailer in the course of its representation of the Union. The Union did not circulate the mailer to nonunion employees of Ernst.

We therefore find that the trial court did not abuse its discretion by denying Ernst's motion for a continuance.

The order of summary judgment is affirmed.

WEBSTER and KENNEDY, JJ., concur.