FILED
COURT OF APPEALS
DIVISION II

2013 MAY 14 AM 9: 00

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| HAIGEUN JUNG and HYOSUN JUNG, husband and wife, | No. 42342-1-II |
| Respondents, | |
| v. | |
| SANG TAE YOON and HYUN SUK YOON, husband and wife, | UNPUBLISHED OPINION |
| Appellants. | |

JOHANSON, A.C.J. — Sang Tae Yoon (Mr. Yoon) and Hyun Suk Yoon (Mrs. Yoon) appeal the trial court's decision finding them liable for defamation and awarding damages to Haigeun Jung (Mr. Jung) and Hyosun Jung (Mrs. Jung).[1] The Yoons argue that (1) they generally received an unfair trial, (2) the Jungs failed to prove reputation damage, (3) the

---

[1] The Yoons' sole assignment of error states that they are challenging the trial court's denial of their motion for a new trial. The Jungs argue that the Yoons' failure to assign error to specific trial court findings or other matters limits our review to the trial court's denial of the motion for new trial. Although the Yoons' assignment of error does not comply with RAP 10.3, and their briefing is vague and poorly structured, they clearly identify several alleged trial court errors sufficiently to allow review. *Goehle v. Fred Hutchinson Cancer Research Ctr.*, 100 Wn. App. 609, 613-14, 1 P.3d 579 ("A technical violation of the rules will not ordinarily bar appellate review where justice is to be served."), *review denied*, 142 Wn.2d 1010 (2000). Thus, to the extent we can discern the Yoons' arguments, we address them. We note, however, that we do not address the numerous potential arguments that the Yoons allude to in the facts section of their brief if they do not also include at least some argument relating to these potential issues in the brief's argument section.

No. 42342-1-II

evidence was insufficient to establish the emotional damages, (4) the trial court improperly admitted documentary evidence of medical/emotional damages, (5) the trial court either did not consider certain evidence or allowed a claim not alleged in the Jungs' complaint, (6) Mrs. Jung was a "public figure" and there was no proof of actual malice, (7) there was insufficient evidence of any defamatory statement, and (8) the evidence did not support the trial court's damages for increased rent. We remand for the trial court to redetermine the damages related to increased housing costs; we otherwise affirm.

FACTS

I. COMPLAINT

The Jungs filed a complaint alleging defamation against the Yoons. The complaint alleged, in part:

> 4. That on or about the 18th day of March 2009 at 5:00 PM the Co-Defendant [Mrs.] Hyun Suk Yoon came to the Plaintiff's store in Renton, known as the Bronson Market, and told the Plaintiff's husband that his wife was having an affair with Woon Y. Song. She further stated that Co-Plaintiff rented a room with this individual and fornicated with him. She further claimed that Co-Plaintiff wife slept with anyone that has money and went to Korea to have an abortion because she was pregnant with another man's baby.
>
> 5. On the next day the Defendant came to the Plaintiff's home and with the 14 year old son at home, pushed the boy to get in the house in order to continue to repeat these defamatory statements. The Co-Plaintiff wife called 911 but when the police called the son said that she had left because he was afraid to tell the police the truth. He said she was no longer there but she was actually standing directly behind the son intimidating him.
>
> 6. During that same time period she repeated the same story to many different individuals who are friends of the Plaintiff's [sic] including the members of the church that they both belong to.
>
> 7. As a result of these defamatory statements the Plaintiff's [sic] have suffered emotional damage as well as financial damage due to her repeating these

2

statements to members of the church, customers, and friends of the Plaintiff's [sic].

8. That none of these statements are true. There is no basis in fact or evidence to support any of these statements. The Defendant wife made these statements knowing that they were false intending to harm the Plaintiff's [sic] in any way that she could.

9. The Plaintiff, [Mrs.] Hyosun Jung, worked at a Korean radio station as an announcer. As a result she is well known to many people. This defamation or [sic] character causes even more damage than it would to a private individual.

10. At the present time the Defendant continued to contact church members by calling people and trying to [sic] the Plaintiff's reputation.

Clerk's Papers (CP) at 3-5.

## II. BENCH TRIAL

The case proceeded to a bench trial. During the trial, the Jungs had counsel, but the Yoons represented themselves. Throughout the proceedings, the trial court attempted to explain the rules and procedures to the Yoons; it also advised them that they would be held to the same standards as an attorney and periodically attempted to clarify testimony.

### A. Mr. Jung

At trial, Mr. Jung testified that the Jungs knew the Yoons because they had all attended the same church in Tacoma. On March 18, 2009, Mrs. Yoon and another church member came to Mr. Jung's Renton grocery store, and Mrs. Yoon told Mr. Jung that his wife had been sleeping with other men, that she had become pregnant by someone else, and that she had an abortion. Although Mr. Jung testified that this event "shocked" him and that this was one of the worst shocks he had ever experienced, he did not believe what Mrs. Yoon told him. VRP (Mar. 21, 2011) at 11.

When Mr. Jung told Mrs. Jung about Mrs. Yoon's accusations later that evening, Mrs. Jung was "a hundred times more" shocked than he was and was "upset." VRP (Mar. 21, 2011) at 13. Mr. Jung testified that before this incident, his wife had not suffered from depression or any other mental health issues, but that she sought medical and mental health treatment following this incident. He also testified that he had not believed Mrs. Yoon's accusations and had faith in his wife, so he did not believe that the incident "really" impacted their relationship. VRP (Mar. 21, 2011) at 12.

Mr. Jung further testified that although they had left their church for several reasons, Mrs. Yoon's accusations were "a major reason" they had done so. VRP (Mar. 21 2011) at 15. In addition, he testified that Mrs. Yoon had arrived at their home and had been trying to "bother" them, so they moved out of their Lakewood home in 2009. VRP (Mar. 21, 2011) at 16.

When the Jungs' counsel asked Mr. Jung whether he had heard about Mrs. Yoon telling others about her allegations related to Mrs. Jung, Mr. Jung responded,

> I heard something, that Mrs. Yoon told the ladies, woman church members, told her about the stories, same story to the other people.

VVRP (Mar. 21, 2011) at 17. The Yoons did not object to this testimony.

## B. Chinok Chong

The Jungs then called Chinok Chong, a record custodian from the Christian Medical Clinic. Ms. Chong identified exhibits 15 and 16, medical records relating to Mrs. Jung's treatment, as records that were made in the regular course of business at her workplace.

The Yoons did not object to Ms. Chong's testimony or object to her being called as a witness despite the fact she was not listed on the Jungs' witness lists. The Yoons did, however,

attempt to object to these exhibits on relevancy grounds, but the trial court advised the Yoons that Ms. Chong was merely the record custodian and admitted exhibits 15 and 16.

## C. Chung Dong

Chung Dong, who knew the Jungs and Yoons through their church, also testified for the Jungs. He testified that in May or June 2009, Mr. Yoon came to his (Mr. Dong's) business and told him that Mrs. Jung was "kind of a hooker and she had some kind of an affair with some person in Tacoma and she [sic] pregnant and she went to Korea and she had a surgery because of it. Abortion[.]" VRP (Mar. 21, 2011) at 37. Mr. Dong further testified that he had heard the same thing "through the vine probably at the church, some people talking about that." VRP (Mar. 21, 2011) at 39. He also stated that his wife may have told him about the gossip at the church. Mr. Dong testified, however, that he did not care about the gossip and that he was not sure whether the rumors he heard from his wife or at church had been started by the Yoons. The Yoons did not object to this testimony.

Mr. Dong also testified about a letter he had written on behalf of the church and sent to the Yoons and another couple telling them to stop coming to the church. Mr. Dong stated that he wrote the letter because the Yoons had wanted to harm the church and had "threaten[ed]" to report church members for immigration violations in an attempt to keep them from going to church and had spread "bad rumors" about people at the church. VRP (Mar. 21, 2011) at 46. The trial court admitted the letter despite Mr. Yoon's assertion that he had not received the letter

and had no knowledge of the letter until a few days before the trial.[2] The Yoons did not object to the admission of this letter on any other ground.

Mr. Dong also testified that after Mr. Yoon spoke to him, he talked to Mrs. Jung about the gossip and she cried. He further testified that in "Korean society," if someone has an affair with another man, "that's, kind of, the end of life"; that although the couple will not usually divorce, "the family will be broken"; and that affairs are devastating to the family involved. VRP (Mar. 22, 2011) at 8.

### D. Mrs. Jung

Mrs. Jung was the next witness. She testified that her husband had told her what Mrs. Yoon had said about her while in the company of the other church member. Mrs. Jung denied any of the allegations being true.

In addition, she testified that the day after Mrs. Yoon talked to Mr. Jung, Mrs. Yoon came to the family home while she (Mrs. Jung) and Mr. Jung were not present. Mrs. Jung's oldest child called Mrs. Jung and told her that Mrs. Yoon had arrived at the house and entered the home "without permission," stating that she was there "to talk about" Mrs. Jung. VRP (Mar. 22, 2011) at 51. The child was frightened because he thought something had happened to Mrs. Jung. Mrs. Jung told the child to call 911; and Mrs. Yoon left the house when the child did so.

Mrs. Jung further testified that the family decided to move because of the rumors, Mrs. Yoon's attempt to contact them at their home, and their children not wanting to go to church

---

[2] Mr. Dong further testified that Mrs. Yoon responded to the letter by calling him and threatening to kill him. He reported this call to the police.

because "[o]ther children whispered" about them. VRP (Mar. 22, 2011) at 52. They moved from their Lakewood home to Bellevue in April 2009. The mortgage on the Lakewood home was $1,900 a month, and they were unable to find renters for the Lakewood home for four months. Eventually, they were able to rent the home for $1,750 a month. The Bellevue home's rent was $2,200 a month for the first 24 months they lived there; the rent increased to $2,300 a month thereafter.

Mrs. Jung also testified that the rumors and Mrs. Yoon's attempt to contact them at their home made her feel like she was "dying"; that she "suffered a lot" and "couldn't do anything"; and that these incidents caused her to have nightmares and other physical symptoms, which worsened over time, so she sought medical assistance and counseling. VRP (Mar. 22, 2011) at 35-36. She believed that the incident had changed her personality and that nothing else had happened during this same time that could have explained her emotional stress and depression.

Mrs. Jung further testified that she sought treatment from her physician, Dr. Lee; a psychiatrist, Dr. Suh; and additional counselors at an Asian counseling center. Mrs. Jung testified that the last time she had counseling was June 2010, but she stated that she thought she would need more treatment in the future, in part because of having to think about it again during the trial. The trial court admitted exhibits 15 through 19, medical records related to Mrs. Jung's medical treatment and counseling. These records repeatedly referred to Mrs. Jung's mental health issues that arose immediately following Mrs. Yoon's visit to Mr. Jung and appearance at the Jungs' home. Other than an early relevancy objection to exhibits 15 and 16, the Yoons did not raise any objections to the admission of these records.

Mrs. Jung further testified that she was still hesitant to go places within the Korean community because she was afraid people had heard these rumors about her. She also testified that she felt that Mr. Jung treated her differently after the incident and that her children could tell that their relationship had changed, noting that they felt that "the loving time between husband and wife was in the past." VRP (Mar. 22, 2011) at 61. In addition, Mrs. Jung testified that she had worked as a radio announcer in Korea and that for nine months in 2006, she had worked at a Korean radio station in the United States; but she asserted that she did not consider herself a "public figure." VRP (Mar. 22, 2011) at 62.

### E. Mrs. Yoon

The Jungs also called Mrs. Yoon as a witness. Mrs. Yoon acknowledged that she had visited Mr. Jung at his Renton store with another church member on March 18, 2009, but she denied having told Mr. Jung that his wife was prostituting herself, that she was sleeping with other men, that she had become pregnant, or that she had an abortion. Mrs. Yoon also denied having repeated such allegations to anyone else. Instead, she asserted that she had gone to Mr. Jung's store to discuss "church issues," which apparently had to do with certain church officials or members helping a church member obtain an abortion for his girlfriend or something to do with her own daughter's relationships within the church. VRP (Mar. 23, 2011) at 39. She also denied forcing her way into the Jungs' home and asserted that the Jungs' child had allowed her in the house and knew who she was. She asserted she was at the house because Mr. Jung had asked her to talk to Mrs. Jung.

Mrs. Yoon also testified as the only defense witness, asserting that she did not make the defamatory statements to Mr. Jung or anyone else.

8

## F. Mr. Yoon

The Jungs also called Mr. Yoon. Mr. Yoon denied having told Mr. Dong about the rumors related to Mrs. Jung. He asserted that he had spoken to Mr. Dong about something Mrs. Yoon "had stress over" and that he may have talked to Mr. Dong about problems he (Mr. Yoon) was having with his wife; but he did not recall exactly what they talked about. VRP (Mar. 23, 2011) at 84.

## G. Trial Court's Oral Ruling

In its oral ruling, the trial court discredited the Yoons' testimony and found that they had "knowingly made false and inflammatory and vicious statements about [Mrs. Jung]." VRP (Mar. 24, 2011) at 54. The trial court awarded the Jungs (1) $56,400 for "out-of-pocket" rents of $2,350 for the previous 24 months; (2) $682.64 in "counseling expenses"; (3) and $75,000 in general damages. VRP (Mar. 24, 2011) at 55-56.

## III. Written Findings of Fact and Conclusions of Law

The trial court then issued written findings of fact and conclusions of law, which provide, in part:

> 2. Defendants knowingly made false inflammatory and vicious statements about Co-Plaintiff Wife.
>
> 3. Church board [was] so upset and appalled by Defendants' conduct of harassing Plaintiff and also other church members [that it] took [the] unusual steps [of] sending a letter to Defendants . . . telling them to stop or [the] church [would] put a restraining order against Defendants.
>
> 4. Defendants offered no credible testimony to the contrary.
>
> 5. [The] [s]o[-]called . . . church's business that Co-Defendant Wife alluded to appears to be a business that existed only in her mind[.] She may [. . .] well have been upset with church but appears to have been [upset by] a choice made

by her daughter who is an adult. Modern day churches that profess to be Christian are not in [the] habit of hauling the congregation up in front of others to brand them as fornicators or with other such defamatory statements which appears to be what Defendants were trying to do. Church and its members have rightly ignored and rejected what Co-Defendant Wife was attempting to do.

6.    Co-Defendant Wife['s] being upset with [the] church . . . set her off [o]n the spree attacking other members of the church[,] threatening to report their immigration status and spreading vicious rumors.

7.    The visits to Co-Plaintiff Husband's grocery store and to the Plaintiffs' house where only their sons were present was not lawful church business but part of Co-Defendant Wife's vendetta against the church.

8.    Co-Defendant husband's trip to the board member's [Mr. Dong's] restaurant as testified was again [for the] purpose of spreading vicious and false rumors.

9.    Insofar as culture such as being immigrants from Korea as in immigrants from other places, a reputation[ ] is important and sensitivity thereto may be more delicate than in the mainstream culture, accordingly, Co-Plaintiff Wife suffered serious injury because of result of the defamation campaign by Co-Defendant Wife[.]

10.    [The c]ourt heard Co-Defendant Wife's testimony as to reasons why she went to Plaintiff's house where neither of the parents was at home whereupon she entered that home alarming the oldest son to call his mother and the call to 911 was an over-the-top conduct. One can see why Plaintiff had to relocate[.]

## CONCLUSION[S] OF LAW

Therefore, the Court after having found the above facts, so concludes as follows[:]

11.    To everyone from whatever culture he or she came from, a reputation is very important. For Co-Defendant Wife to have made [these] kind[s] of statements and spread[ these kinds of] rumors about Co-Plaintiff Wife and enter[ ] into Plaintiff's house when [the] parents not present is appalling, reasons being [sic] because she was angry with the church, the members of the church not assisting her in some sort of moral leading was appropriate.

12.    Defendants without any privilege have knowingly made false inflammatory and vicious statements about Co-Plaintiff Wife to others including church members and Co-Plaintiff husband.

. . . .

15.    Defendants to pay out of pocket costs of $2,350 for [the] last 24 months for the rent and continue $2,350 out of pocket cost for the period of time.

16.    Co-Plaintiff Wife was so disturbed by the rumors and the vicious campaign by Co-Defendant Wife that she sought medical treatment[ ] by psychiatrist and counselors, and [m]edical [d]octors.

17.    In term[s] of Special Damage[s], out of pocket cost[s] of moving to a new location and rents being [$]56,420.00 and the out of pocket costs of counseling expense being with Dr. Suh $682[.]64 for the total of $57,682.64.

18.    And in term[s] of General Damage[s], Plaintiffs are awarded $75,000.00.

19.    Plaintiffs are also awarded attorney's fee and Court costs.

CP at 42-44.

## IV. Motion for New Trial

After the oral ruling but before the trial court entered its written findings of fact and conclusions of law or the judgment, the Yoons, now represented by counsel, moved for a new trial. Later that month, after the trial court issued its written findings and conclusions, the Yoons noted the motion for new trial, and the trial court denied the motion.[3]

## ANALYSIS

### I. GENERAL ALLEGATIONS OF TRIAL COURT ERROR

The Yoons first state, "The trial court allowed the case and the facts to become convoluted, confusing, and to swing into areas completely unrelated to the single issue of

---

[3] The appellate record does not contain any report of proceedings from a hearing on the motion for a new trial.

11

defamation and the damages which flowed therefrom." Br. of Appellant at 24. They appear to argue that the confusion during the proceedings rendered the trial unfair. We disagree.

This general statement of error does not identify any potential error with sufficient detail for us to determine the exact nature of the Yoons' argument. To the extent they are arguing that the trial court caused the case to become confusing and inquired into irrelevant areas, the record shows that any confusion was caused in large part by the Yoons' pro se representation and language/translation issues and that any discussion of potentially irrelevant areas by the trial court were attempts to clarify the testimony. Finally, to the extent the Yoons are arguing that they did not receive a fair trial because they were pro se, we note that pro se litigants are held to the same standards as attorneys. *In re Marriage of Olson*, 69 Wn. App. 621, 626, 850 P.2d 527 (1993).

## II. "REPUTATION DAMAGE"

The Yoons next argue that there was no evidence of "reputation damage beyond the testimony of Mrs. Jung," and that additional evidence was required to find them guilty of defamation. Br. of Appellant at 24. Again, we disagree.

Not every misstatement of fact is actionable. *Mark v. Seattle Times*, 96 Wn.2d 473, 493, 635 P.2d 1081 (1981), *cert. denied*, 457 U.S. 1124 (1982). "Rather, it must be apparent that the false statement or communication presents a substantial danger to the plaintiff's personal or business reputation." *Ernst Home Ctr., Inc. v. United Food & Commercial Workers Int'l Union, AFL-CIO, Local 1001*, 77 Wn. App. 33, 44, 888 P.2d 1196 (1995) (citing *Mark*, 96 Wn.2d at 493; *Taskett v. KING Broad. Co.*, 86 Wn.2d 439, 443, 546 P.2d 81 (1976)). Accordingly, the trial court must initially decide, as a matter of law, whether the statement or communication is

capable of a defamatory meaning. *Swartz v. World Publ'g Co.*, 57 Wn.2d 213, 215, 356 P.2d 97 (1960) (citing *Purvis v. Bremer's, Inc.*, 54 Wn.2d 743, 753, 344 P.2d 705 (1959)). Here, the trial court heard evidence from Mr. Dong that others in the church community, including his own wife, had heard the rumors about Mrs. Jung's alleged infidelity and prostitution and that such behavior could have devastating effects within the Korean community. This testimony is sufficient to show that the false statements presented a substantial danger to Mrs. Jung's reputation.

Furthermore, the Yoons do not establish that proof of actual harm to Mrs. Jung's reputation was required to prove defamation. As noted in the Restatement (Second) of Torts comments:

> Actual harm to reputation [is] not necessary to make communication defamatory. To be defamatory, it is not necessary that the communication actually cause harm to another's reputation or deter third persons from associating or dealing with him. Its character depends on its general tendency to have such an effect.

RESTATEMENT (SECOND) OF TORTS § 559 cmt. d (1977). Here, there was evidence that the Yoons told others in their community that Mrs. Jung was, in effect, a prostitute—this type of information clearly has the general tendency to harm a person's reputation in most communities. Furthermore, Mr. Dong's testimony that extramarital affairs are "devastating" to the family, and a wife having an affair with another man is "kind of, the end of life," was sufficient to show that the accusation that Mrs. Jung was having affairs would have the general tendency to affect her reputation in the Korean community. VRP (Mar. 22, 2011) at 8.

In a related argument, the Yoons argue that this case was a defamation case and not a "false light" case and, thus, was focused solely on the damage to Mrs. Jung's reputation, rather

than compensating her for any "mental suffering." Br. of Appellant at 26. Although "false light" claims focus on compensation for mental suffering rather than damage to reputation and defamation claims focus more on reputation damage, the fact each claim has a different focus does not mean that defamation damages cannot include mental suffering. *See Eastwood v. Cascade Broad. Co.*, 106 Wn.2d 466, 471, 722 P.2d 1295 (1986). "[I]njury to reputation, character, feelings and *mental suffering* are proper elements of general damage" in a defamation case. *Farrar v. Tribune Publ'g Co.*, 57 Wn.2d 549, 553, 358 P.2d 792 (1961) (citing *Viss v. Calligan*, 91 Wash. 673, 158 P. 1012 (1916); *Woodhouse v. Powles*, 43 Wash. 617, 86 P. 1063 (1906)); *see also Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 588, 943 P.2d 350 (1997), *review denied*, 134 Wn.2d 1013 (1998). Accordingly, this argument also fails.

### III. EVIDENCE OF EMOTIONAL DAMAGES

The Yoons next argue that there was no testimony from "medical experts" about the alleged emotional damage. Br. of Appellant at 24. But the Yoons cite no authority requiring such evidence be presented through expert testimony. Here, Mrs. Jung's testimony and the exhibits from her providers support Mrs. Jung's claim of emotional damage. Additionally, Mrs. Jung's testimony about her physical and mental health issues was supported by (1) her husband's testimony that she had not had any similar issues before this incident and that she sought help at a local clinic to address the stress and shock; and (2) the medical records referring to the incident as causing anxiety and other physical and mental health symptoms. Accordingly, this argument also fails.

## IV. ADMISSION OF EVIDENCE OF MEDICAL AND PSYCHOLOGICAL HARM

The Yoons further argue that "[d]ocuments of medical and psychological harm were admitted without foundation or authenticity or with causation as to the alleged injury and the nature of the defamation." Br. of Appellant at 24. But the Yoons did not object to the admission of any of these documents on these grounds. Again, we note that pro se litigants are held to the same standards as attorneys. *Olson*, 69 Wn. App. at 626. Accordingly, they have waived this argument.

## V. MR. DONG'S TESTIMONY AND MR. YOON'S DEFAMATORY STATEMENTS

The Yoons next state that the trial court's findings and conclusions of law did not mention Mr. Dong's testimony or "any bad act on the part of Mr. Yoon." Br. of Appellant at 25. It is difficult to discern what the Yoons intend to argue here, but the trial court's Finding of Fact 8 clearly refers to Mr. Dong's testimony and states that the trial court found that Mr. Yoon communicated with Mr. Dong for the purpose of spreading the rumors at issue.

To the extent the Yoons may be arguing that this evidence did not relate to any matters pleaded in the Jungs' complaint because the complaint did not specifically allege that Mr. Yoon personally made any defamatory statements that argument also fails. Because the Yoons failed to object to the testimony about Mr. Yoon's defamatory communications with Mr. Dong, they have impliedly consented to the trial court's consideration of this issue. *See* CR 15(b); *Dewey v. Tacoma Sch. Dist. No. 10*, 95 Wn. App. 18, 26, 974 P.2d 847 (1999).

## VI. NOT A PUBLIC FIGURE: ACTUAL MALICE NOT REQUIRED

The Yoons next argue that because the Jungs alleged in their complaint that Mrs. Jung had been a radio broadcaster, Mrs. Jung was a "public figure" and the Jungs had to prove actual malice, which they failed to do. Br. of Appellant at 25-26. Again, we disagree.

The record shows that Mrs. Jung had been a radio broadcaster in Korea and that she had worked at, but was not a broadcaster at, a Korean radio station in the United States for nine months in 2006. This does not establish that Mrs. Jung was a public figure in 2009. Furthermore, there is nothing whatsoever in the record revealing the nature of Mrs. Jung's public exposure in her radio-related jobs or suggesting that the nature of the defamatory statements had any relationship with any potential public role Mrs. Jung may have played. *See Clawson v. Longview Publ'g Co.*, 91 Wn.2d 408, 417, 589 P.2d 1223 (1979) (one factor courts examine when determining if the public official/figure actual malice standard applies is "the nexus between that position and the allegedly defamatory information."). Accordingly, this argument fails.

## VII. ADDITIONAL SUFFICIENCY ARGUMENTS

The Yoons next argue that "there has to be more than the wisp of suspicion that other people know about these rumors or statements, and that Plaintiff is avoiding her community, her church, and her market place for fear that some or all of the people are staring at her with

knowledge of the rumor." Br. of Appellant at 27. It appears that the Yoons are arguing that there was insufficient evidence of any defamatory communication or reputation damage.[4]

The record shows that the Jungs presented sufficient evidence to prove that the Yoons had communicated the defamatory statements to others. Specifically, it shows that (1) Mr. Yoon communicated these statements to Mr. Dong, and (2) Mrs. Yoon had communicated these statements to Mr. Jung in front of another church member. Furthermore, as discussed above, proof of damage to Mrs. Jung's reputation was not required.

## VIII. DAMAGES: INCREASED RENTS

Finally, Yoons argue that the record does not support the $56,400 in increased "rent" the trial court awarded. Br. of Appellant at 28. We agree.

The trial court's written conclusions of law show that the trial court calculated the Jungs' "out of pocket costs" for rent for the first 24 months following their move as $2,350 (the cost of the Bellevue rental and the $150 difference between the rent they received on their Lakewood home and the Lakewood home's mortgage once the Jungs found renters for the Lakewood home). CP at 43. This amount, however, reflects the Jungs' *full housing costs* for a 24-month period, not the *increased* housing costs caused by the defamation. The trial court failed to consider that the Jungs would have been paying $1,900 in monthly housing costs regardless of the move. Accordingly, we remand to the trial court to recalculate the damages related to the

---

[4] The elements of defamation are (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. *Mohr v. Grant*, 153 Wn.2d 812, 822, 108 P.3d 768 (2005).

*increased* housing expenses taking into account only those expenses that the Jungs would have incurred if the defamation had not occurred.[5]

We remand for redetermination of the increased housing costs damages; we otherwise affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Johanson, A.C.J.

We concur:

Quinn-Brintnall, J.

Bjorgen, J.

---

[5] The Jungs assert that $56,420 was intended to compensate them for their continuing increased expenses. But the record suggests that the trial court's award was based on 24 months times $2,350. If the trial court intended to include additional compensation for continued increased rents, it may address that issue on remand.